MONELL ET AL. *v.* DEPARTMENT OF SOCIAL SERV-
ICES OF THE CITY OF NEW YORK ET AL.

No. 75–1914. Argued November 2, 1977—Decided June 6, 1978

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined, and in Parts I, III, and V of which STEVENS, J., joined. POWELL, J., filed a concurring opinion, *post*, p. 704. STEVENS, J., filed a statement concurring in part, *post*, p. 714. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 714.

*Oscar Chase* argued the cause for petitioners. With him on the briefs were *Nancy Stearns, Jack Greenberg,* and *Eric Schnapper.*

*L. Kevin Sheridan* argued the cause for respondents. With him on the brief was *W. Bernard Richland.** 

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioners, a class of female employees of the Department of Social Services and of the Board of Education of the city of New York, commenced this action under 42 U. S. C. § 1983 in July 1971.[1] The gravamen of the complaint was that the

---

*Michael H. Gottesman, Robert M. Weinberg, David Rubin, Albert E. Jenner, Jr., Robert A. Murphy,* and *William E. Caldwell* filed a brief for the National Education Assn. et al. as *amici curiae* urging reversal.

[1] The complaint was amended on September 14, 1972, to allege a claim under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e et seq. (1970 ed. and Supp. V). The District Court held that the 1972 amendments to Title VII did not apply retroactively to

Board and the Department had as a matter of official policy compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons.[2] Cf. *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974). The suit sought injunctive relief and backpay for periods of unlawful forced leave. Named as defendants in the action were the Department and its Commissioner, the Board and its Chancellor, and the city of New York and its Mayor. In each case, the individual defendants were sued solely in their official capacities.[3]

On cross-motions for summary judgment, the District Court for the Southern District of New York held moot petitioners' claims for injunctive and declaratory relief since the city of New York and the Board, after the filing of the complaint, had changed their policies relating to maternity leaves so that no pregnant employee would have to take leave unless she was medically unable to continue to perform her job. 394 F. Supp. 853, 855 (1975). No one now challenges this conclu-

---

discrimination suffered prior to those amendments even when an action challenging such prior discrimination was pending on the date of the amendments. 394 F. Supp. 853, 856 (SDNY 1975). This holding was affirmed on appeal. 532 F. 2d 259, 261–262 (CA2 1976). Although petitioners sought certiorari on the Title VII issue as well as the § 1983 claim, we restricted our grant of certiorari to the latter issue. 429 U. S. 1071.

[2] The plaintiffs alleged that New York had a citywide policy of forcing women to take maternity leave after the fifth month of pregnancy unless a city physician and the head of an employee's agency allowed up to an additional two months of work. Amended Complaint ¶ 28, App. 13–14. The defendants did not deny this, but stated that this policy had been changed after suit was instituted. Answer ¶ 13, App. 32–33. The plaintiffs further alleged that the Board had a policy of requiring women to take maternity leave after the seventh month of pregnancy unless that month fell in the last month of the school year, in which case the teacher could remain through the end of the school term. Amended Complaint ¶¶ 39, 42, 45, App. 18–19, 21. This allegation was denied. Answer ¶¶ 18, 22, App. 35, 37.

[3] Amended Complaint ¶ 24, App. 11–12.

sion. The court did conclude, however, that the acts complained of were unconstitutional under *LaFleur, supra.* 394 F. Supp., at 855. Nonetheless plaintiffs' prayers for backpay were denied because any such damages would come ultimately from the city of New York and, therefore, to hold otherwise would be to "circumven[t]" the immunity conferred on municipalities by *Monroe* v. *Pape,* 365 U. S. 167 (1961). See 394 F. Supp., at 855.

On appeal, petitioners renewed their arguments that the Board of Education [4] was not a "municipality" within the meaning of *Monroe* v. *Pape, supra,* and that, in any event, the District Court had erred in barring a damages award against the individual defendants. The Court of Appeals for the Second Circuit rejected both contentions. The court first held that the Board of Education was not a "person" under § 1983 because "it performs a vital governmental function ... , and, significantly, while it has the right to determine how the funds appropriated to it shall be spent ... , it has no final say in deciding what its appropriations shall be." 532 F. 2d 259, 263 (1976). The individual defendants, however, were "persons" under § 1983, even when sued solely in their official capacities. 532 F. 2d, at 264. Yet, because a damages award would "have to be paid by a city that was held not to be amenable to such an action in *Monroe* v. *Pape,*" a damages action against officials sued in their official capacities could not proceed. *Id.,* at 265.

We granted certiorari in this case, 429 U. S. 1071, to consider

"Whether local governmental officials and/or local independent school boards are 'persons' within the meaning of 42 U. S. C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?" Pet. for Cert. 8.

---

[4] Petitioners conceded that the Department of Social Services enjoys the same status as New York City for *Monroe* purposes. See 532 F. 2d, at 263.

Although, after plenary consideration, we have decided the merits of over a score of cases brought under § 1983 in which the principal defendant was a school board [5]—and, indeed, in some of which § 1983 and its jurisdictional counterpart, 28 U. S. C. § 1343, provided the only basis for jurisdiction[6]—we indicated in *Mt. Healthy City Board of Education* v. *Doyle,* 429 U. S. 274, 279 (1977), last Term that the question presented here was open and would be decided "another day." That other day has come and we now overrule *Monroe* v. *Pape, supra,* insofar as it holds that local governments are wholly immune from suit under § 1983.[7]

---

[5] *Milliken* v. *Bradley,* 433 U. S. 267 (1977); *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (1977); *Vorchheimer* v. *School District of Philadelphia,* 430 U. S. 703 (1977); *East Carroll Parish School Board* v. *Marshall,* 424 U. S. 636 (1976); *Milliken* v. *Bradley,* 418 U. S. 717 (1974); *Bradley* v. *Richmond School Board,* 416 U. S. 696 (1974); *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974); *Keyes* v. *School District No. 1, Denver, Colo.,* 413 U. S. 189 (1973); *San Antonio School District* v. *Rodriguez,* 411 U. S. 1 (1973); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971); *Northcross* v. *Memphis Board of Education,* 397 U. S. 232 (1970); *Carter* v. *West Feliciana Parish School Board,* 396 U. S. 226 (1969); *Alexander* v. *Holmes County Board of Education,* 396 U. S. 19 (1969); *Kramer* v. *Union Free School District,* 395 U. S. 621 (1969); *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503 (1969); *Monroe* v. *Board of Comm'rs,* 391 U. S. 450 (1968); *Raney* v. *Board of Education,* 391 U. S. 443 (1968); *Green* v. *New Kent County School Board,* 391 U. S. 430 (1968); *Abington School District* v. *Schempp,* 374 U. S. 203 (1963); *Goss* v. *Board of Education,* 373 U. S. 683 (1963); *McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Orleans Parish School Board* v. *Bush,* 365 U. S. 569 (1961); *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

[6] *Cleveland Board of Education* v. *LaFleur, supra,* at 636; App. in *Keyes* v. *School District No. 1, Denver, Colo.,* O. T. 1972, No. 71–507, p. 4a; App. in *Swann* v. *Charlotte-Mecklenburg Board of Education,* O. T. 1970, No. 281, p. 465a; Pet. for Cert. in *Northcross* v. *Memphis Board of Education,* O. T. 1969, No. 1136, p. 3; *Tinker* v. *Des Moines Independent School District, supra,* at 504; *McNeese* v. *Board of Education, supra,* at 671.

[7] However, we do uphold *Monroe* v. *Pape* insofar as it holds that the doctrine of *respondeat superior* is not a basis for rendering municipalities

## I

In *Monroe* v. *Pape,* we held that "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]." 365 U. S., at 187. The sole basis for this conclusion was an inference drawn from Congress' rejection of the "Sherman amendment" to the bill which became the Civil Rights Act of 1871, 17 Stat. 13, the precursor of § 1983. The amendment would have held a municipal corporation liable for damage done to the person or property of its inhabitants by *private* persons "riotously and tumultuously assembled." [8] Cong. Globe, 42d Cong., 1st Sess., 749 (1871) (hereinafter Globe). Although the Sherman amendment did not seek to amend § 1 of the Act, which is now § 1983, and although the nature of the obligation created by that amendment was vastly different from that created by § 1, the Court nonetheless concluded in *Monroe* that Congress must have meant to exclude municipal corporations from the coverage of § 1 because " 'the House [in voting against the Sherman amendment] had solemnly decided that in their judgment Congress had no constitutional power to impose any *obligation* upon county and town organizations, the mere instrumentality for the administration of state law.' " 365 U. S., at 190 (emphasis added), quoting Globe 804 (Rep. Poland). This statement, we thought, showed that Congress doubted its "constitutional power . . . to impose *civil liability* on municipalities," 365 U. S., at 190 (emphasis added), and that such doubt would have extended to any type of civil liability.[9]

---

✓ liable under § 1983 for the constitutional torts of their employees. See Part II, *infra.*

[8] We expressly declined to consider "policy considerations" for or against municipal liability. See 365 U. S., at 191.

[9] Mr. Justice Douglas, the author of *Monroe,* has suggested that the municipal exclusion might more properly rest on a theory that Congress sought to prevent the financial ruin that civil rights liability might impose on municipalities. See *City of Kenosha* v. *Bruno,* 412 U. S. 507, 517–520

A fresh analysis of the debate on the Civil Rights Act of 1871, and particularly of the case law which each side mustered in its support, shows, however, that *Monroe* incorrectly equated the "obligation" of which Representative Poland spoke with "civil liability."

## A. An Overview

There are three distinct stages in the legislative consideration of the bill which became the Civil Rights Act of 1871. On March 28, 1871, Representative Shellabarger, acting for a House select committee, reported H. R. 320, a bill "to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes." H. R. 320 contained four sections. Section 1, now codified as 42 U. S. C. § 1983, was the subject of only limited debate and was passed without amendment.[10] Sections 2 through 4 dealt primarily with the "other purpose" of suppressing Ku Klux Klan violence in the Southern States.[11] The wisdom and constitutionality of these sections—not § 1, now § 1983—were the subject of almost all congressional debate and each of these sections was amended. The House finished its initial debates on H. R. 320 on April 7, 1871, and one week later the Senate also voted out a bill.[12] Again, debate on § 1 of the bill was limited and that section was passed as introduced.

---

(1973). However, this view has never been shared by the Court, see *Monroe* v. *Pape*, 365 U. S., at 190; *Moor* v. *County of Alameda*, 411 U. S. 693, 708 (1973), and the debates do not support this position.

[10] Globe 522.

[11] Briefly, § 2 created certain federal crimes in addition to those defined in § 2 of the 1866 Civil Rights Act, 14 Stat. 27, each aimed primarily at the Ku Klux Klan. Section 3 provided that the President could send the militia into any State wracked with Klan violence. Finally, § 4 provided for suspension of the writ of habeas corpus in enumerated circumstances, again primarily those thought to obtain where Klan violence was rampant. See Cong. Globe, 42d Cong., 1st Sess., App. 335–336 (1871) (hereinafter Globe App.).

[12] Globe 709.

Immediately prior to the vote on H. R. 320 in the Senate, Senator Sherman introduced his amendment.[13] This was *not* an amendment to § 1 of the bill, but was to be added as § 7 at the end of the bill. Under the Senate rules, no discussion of the amendment was allowed and, although attempts were made to amend the amendment, it was passed as introduced. In this form, the amendment did *not* place liability on municipal corporations, but made any inhabitant of a municipality liable for damage inflicted by persons "riotously and tumultuously assembled." [14]

The House refused to acquiesce in a number of amendments made by the Senate, including the Sherman amendment, and the respective versions of H. R. 320 were therefore sent to a conference committee. Section 1 of the bill, however, was not a subject of this conference since, as noted, it was passed verbatim as introduced in both Houses of Congress.

On April 18, 1871, the first conference committee completed its work on H. R. 320. The main features of the conference committee draft of the Sherman amendment were these: [15] First, a cause of action was given to persons injured by

> "any persons riotously and tumultuously assembled together . . . with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude . . . ."

[13] See *id.,* at 663, quoted in Appendix to this opinion, *infra,* at 702–703.

[14] *Ibid.* An action for recovery of damages was to be in the federal courts and denominated as a suit against the county, city, or parish in which the damage had occurred. *Ibid.* Execution of the judgment was not to run against the property of the government unit, however, but against the private property of any inhabitant. *Ibid.*

[15] See Globe 749 and 755, quoted in Appendix to this opinion, *infra,* at 703–704.

Second, the bill provided that the action would be against the county, city, or parish in which the riot had occurred and that it could be maintained by either the person injured or his legal representative. Third, unlike the amendment as proposed, the conference substitute made the government defendant liable on the judgment if it was not satisfied against individual defendants who had committed the violence. If a municipality were liable, the judgment against it could be collected

> "by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment [would become] a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof."

In the ensuing debate on the first conference report, which was the first debate of any kind on the Sherman amendment, Senator Sherman explained that the purpose of his amendment was to enlist the aid of persons of property in the enforcement of the civil rights laws by making their property "responsible" for Ku Klux Klan damage.[16] Statutes drafted on a similar theory, he stated, had long been in force in England and were in force in 1871 in a number of States.[17]

---

[16] "Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome." Globe 761.

Senator Sherman was apparently unconcerned that the conference committee substitute, unlike the original amendment, did not place liability for riot damage directly on the property of the well-to-do, but instead placed it on the local government. Presumably he assumed that taxes would be levied against the property of the inhabitants to make the locality whole.

[17] According to Senator Sherman, the law had originally been adopted in England immediately after the Norman Conquest and had most recently been promulgated as the law of 7 & 8 Geo. 4, ch. 31 (1827). See Globe

Nonetheless there were critical differences between the conference substitute and extant state and English statutes: The conference substitute, unlike most state riot statutes, lacked a short statute of limitations and imposed liability on the government defendant whether or not it had notice of the impending riot, whether or not the municipality was authorized to exercise a police power, whether or not it exerted all reasonable efforts to stop the riot, and whether or not the rioters were caught and punished.[18]

The first conference substitute passed the Senate but was rejected by the House. House opponents, within whose ranks were some who had supported § 1, thought the Federal Government could not, consistent with the Constitution, obligate municipal corporations to keep the peace if those corporations were neither so obligated nor so authorized by their state charters. And, because of this constitutional objection, opponents of the Sherman amendment were unwilling to impose damages liability for nonperformance of a duty which Congress could not require municipalities to perform. This position is reflected in Representative Poland's statement that is quoted in *Monroe*.[19]

Because the House rejected the first conference report a second conference was called and it duly issued its report. The second conference substitute for the Sherman amendment abandoned municipal liability and, instead, made "any per-

---

760. During the course of the debates, it appeared that Kentucky, Maryland, Massachusetts, and New York had similar laws. See *id.*, at 751 (Rep. Shellabarger); *id.*, at 762 (Sen. Stevenson); *id.*, at 771 (Sen. Thurman); *id.*, at 792 (Rep. Butler). Such a municipal liability was apparently common throughout New England. See *id.*, at 761 (Sen. Sherman).

[18] In the Senate, opponents, including a number of Senators who had voted for § 1 of the bill, criticized the Sherman amendment as an imperfect and impolitic rendering of the state statutes. Moreover, as drafted, the conference substitute could be construed to protect rights that were not protected by the Constitution. A complete critique was given by Senator Thurman. See Globe 770–772.

[19] See 365 U. S., at 190, quoted *supra*, at 664.

son or persons having knowledge [that a conspiracy to violate civil rights was afoot], and having power to prevent or aid in preventing the same," who did not attempt to stop the same, liable to any person injured by the conspiracy.[20] The amendment in this form was adopted by both Houses of Congress and is now codified as 42 U. S. C. § 1986.

The meaning of the legislative history sketched above can most readily be developed by first considering the debate on the report of the first conference committee. This debate shows conclusively that the constitutional objections raised against the Sherman amendment—on which our holding in *Monroe* was based, see *supra,* at 664—would not have prohibited congressional creation of a civil remedy against state municipal corporations that infringed federal rights. Because § 1 of the Civil Rights Act does not state expressly that municipal corporations come within its ambit, it is finally necessary to interpret § 1 to confirm that such corporations were indeed intended to be included within the "persons" to whom that section applies.

## B. Debate on the First Conference Report

The style of argument adopted by both proponents and opponents of the Sherman amendment in both Houses of Congress was largely legal, with frequent references to cases decided by this Court and the Supreme Courts of the several States. Proponents of the Sherman amendment did not, however, discuss in detail the argument in favor of its constitutionality. Nonetheless, it is possible to piece together such an argument from the debates on the first conference report and those on § 2 of the civil rights bill, which, because it allowed the Federal Government to prosecute crimes "in the States," had also raised questions of federal power. The account of Representative Shellabarger, the House sponsor of H. R. 320, is the most complete.

---

[20] See Globe 804, quoted in Appendix to this opinion, *infra,* at 704.

Shellabarger began his discussion of H. R. 320 by stating that "there is a domain of constitutional law involved in the right consideration of this measure which is wholly unexplored." Globe App. 67. There were analogies, however. With respect to the meaning of § 1 of the Fourteenth Amendment, and particularly its Privileges or Immunities Clause, Shellabarger relied on the statement of Mr. Justice Washington in *Corfield* v. *Coryell*, 4 Wash. C. C. 371 (CC ED Pa. 1825), which defined the privileges protected by Art. IV:

> " 'What these fundamental privileges are [,] it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: protection by the Government;'—
>
> "*Mark that*—
>
> " '*protection by the Government;* the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety . . . .' " Globe App. 69 (emphasis added), quoting 4 Wash. C. C., at 380–381.

Building on his conclusion that citizens were owed protection—a conclusion not disputed by opponents of the Sherman amendment [21]—Shellabarger then considered Congress' role in providing that protection. Here again there were precedents:

"[Congress has always] assumed to enforce, as against

---

[21] See Globe 758 (Sen. Trumbull); *id.*, at 772 (Sen. Thurman); *id.*, at 791 (Rep. Willard). The Supreme Court of Indiana had so held in giving effect to the Civil Rights Act of 1866. See *Smith* v. *Moody*, 26 Ind. 299 (1866) (following *Coryell*), one of three State Supreme Court cases referred to in Globe App. 68 (Rep. Shellabarger). Moreover, § 2 of the 1871 Act as passed, unlike § 1, prosecuted persons who violated federal rights whether or not that violation was under color of official authority, apparently on the theory that Ku Klux Klan violence was infringing the right of protection defined by *Coryell*. Nonetheless, opponents argued that municipalities were not generally charged by the States with keeping

the States, and also persons, every one of the provisions of the Constitution. Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in [Art. I, § 10,] relate to the divisions of the political powers of the State and General Governments. . . . These prohibitions upon political powers of the States are all of such nature that they can be, and even have been, . . . enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States 'enforced' these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the rights or the liabilities of persons within the States, as between such persons and the States.

"These three are: first, that as to fugitives from justice; [22] second, that as to fugitives from service, (or slaves;) [23] third, that declaring that the 'citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.' [24]

---

the peace and hence did not have police forces, so that the duty to afford protection ought not devolve on the municipality, but on whatever agency of state government was charged by the State with keeping the peace. See *infra*, at 673, and n. 30. In addition, they argued that Congress could not constitutionally add to the duties of municipalities. See *infra*, at 673–678.

[22] U. S. Const., Art. IV, § 2, cl. 2:

"A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

[23] *Id.*, cl. 3:

"No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due."

[24] *Id.*, cl. 1.

"And, sir, every one of these—the only provisions where it was deemed that legislation was required to enforce the constitutional provisions—the only three where the rights or liabilities of persons in the States, as between these persons and the States, are directly provided for, Congress has by legislation affirmatively interfered to protect . . . such persons." Globe App. 69–70.

Of legislation mentioned by Shellabarger, the closest analog of the Sherman amendment, ironically, was the statute implementing the fugitives from justice and fugitive slave provisions of Art. IV—the Act of Feb. 12, 1793, 1 Stat. 302—the constitutionality of which had been sustained in 1842, in *Prigg* v. *Pennsylvania,* 16 Pet. 539. There, Mr. Justice Story, writing for the Court, held that Art. IV gave slaveowners a federal right to the unhindered possession of their slaves in whatever State such slaves might be found. 16 Pet., at 612. Because state process for recovering runaway slaves might be inadequate or even hostile to the rights of the slaveowner, the right intended to be conferred could be negated if left to state implementation. *Id.,* at 614. Thus, since the Constitution guaranteed the right and this in turn required a remedy, Story held it to be a "natural inference" that Congress had the power itself to ensure an appropriate (in the Necessary and Proper Clause sense) remedy for the right. *Id.,* at 615.

Building on *Prigg,* Shellabarger argued that a remedy against municipalities and counties was an appropriate—and hence constitutional—method for ensuring the protection which the Fourteenth Amendment made every citizen's federal right.[25] This much was clear from the adoption of such statutes by the several States as devices for suppressing riot.[26] Thus, said Shellabarger, the only serious question remaining

---

[25] See Globe 751. See also *id.,* at 760 (Sen. Sherman) ("If a State may . . . pass a law making a county . . . responsible for a riot in order to deter such crime, then we may pass the same remedies . . .").

[26] *Id.,* at 751; see n. 17, *supra.*

was "whether, since a county is an integer or part of a State, the United States can impose upon it, as such, *any obligations to keep the peace* in obedience to United States laws." [27] This he answered affirmatively, citing *Board of Comm'rs* v. *Aspinwall*, 24 How. 376 (1861), the first of many cases [28] upholding the power of federal courts to enforce the Contract Clause against municipalities.[29]

House opponents of the Sherman amendment—whose views are particularly important since only the House voted down the amendment—did not dispute Shellabarger's claim that the Fourteenth Amendment created a federal right to protection, see n. 21, *supra,* but they argued that the local units of government upon which the amendment fastened liability were not obligated to keep the peace at state law and further that the Federal Government could not constitutionally require local governments to create police forces, whether this requirement was levied directly, or indirectly by imposing damages for breach of the peace on municipalities. The most complete statement of this position is that of Representative Blair: [30]

"The proposition known as the Sherman amend-

---

[27] Globe 751 (emphasis added). Compare this statement with Representative Poland's remark upon which our holding in *Monroe* was based. See *supra,* at 664.

[28] See, *e. g., Gelpcke* v. *Dubuque,* 1 Wall. 175 (1864); *Von Hoffman* v. *City of Quincy,* 4 Wall. 535 (1867); *Riggs* v. *Johnson County,* 6 Wall. 166 (1868); *Weber* v. *Lee County,* 6 Wall. 210 (1868); *Supervisors* v. *Rogers,* 7 Wall. 175 (1869); *Benbow* v. *Iowa City,* 7 Wall. 313 (1869); *Supervisors* v. *Durant,* 9 Wall. 415 (1870). See generally 6 C. Fairman, History of the Supreme Court of the United States: Reconstruction and Reunion, 1864–1888, chs. 17–18 (1971).

[29] See Globe 751–752.

[30] Others taking a view similar to Representative Blair's included: Representative Willard, see *id.,* at 791; Representative Poland, see *id.,* at 794; Representative Burchard, see *id.,* at 795; Representative Farnsworth, see *id.,* at 799. Representative Willard also took a somewhat different position: He thought that the Constitution would not allow the Federal

ment . . . is entirely new. It is altogether without a precedent in this country. . . . That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may please upon the municipalities, which are the creations of the States alone. . . .

". . . [H]ere it is proposed, not to carry into effect an obligation which rests upon the municipality, but to

Government to dictate the manner in which a State fulfilled its obligation of protection. That is, he thought it a matter of state discretion whether it delegated the peacekeeping power to a municipal or county corporation, to a sheriff, etc. He did not doubt, however, that the Federal Government could impose on the *States* the obligation imposed by the Sherman amendment, and presumably he would have enforced the amendment against a municipal corporation to which the peacekeeping obligation had been delegated. See *id.,* at 791.

Opponents of the Sherman amendment in the Senate agreed with Blair that Congress had no power to pass the Sherman amendment because it fell outside limits on national power implicit in the federal structure of the Constitution and recognized in, *e. g., Collector* v. *Day,* 11 Wall. 113 (1871). However, the Senate opponents focused not on the amendment's attempt to obligate municipalities to keep the peace, but on the lien created by the amendment, which ran against *all* money and property of a defendant municipality, including property held for public purposes, such as jails or courthouses. Opponents argued that such a lien once entered would have the effect of making it impossible for the municipality to function, since no one would trade with it. See, *e. g.,* Globe 762 (Sen. Stevenson); *id.,* at 763 (Sen. Casserly). Moreover, everyone knew that sound policy prevented execution against public property since this, too, was needed if local government was to survive. See, *e. g., ibid.* See also *Meriwether* v. *Garrett,* 102 U. S. 472, 501, 513 (1880) (recognizing principle that public property of a municipality was not subject to execution); 2 J. Dillon, The Law of Municipal Corporations §§ 445–446 (1873 ed.) (same).

Although the arguments of the Senate opponents appear to be a correct analysis of then-controlling constitutional and common-law principles, their arguments are not relevant to an analysis of the constitutionality of § 1 of the Civil Rights Act since any judgment under that section, as in any civil suit in the federal courts in 1871, would have been enforced pursuant to *state* laws under the Process Acts of 1792 and 1828. See Act of May 8, 1792, ch. 36, 1 Stat. 275; Act of May 19, 1828, 4 Stat. 278.

create that obligation, and that is the provision I am unable to assent to. The parallel of the hundred does not in the least meet the case. The power that laid the obligation upon the hundred first put the duty upon the hundred that it should perform in that regard, and failing to meet the obligation which had been laid upon it, it was very proper that it should suffer damage for its neglect. . . .

". . . [T]here are certain rights and duties that belong to the States, . . . there are certain powers that inhere in the State governments. They create these municipalities, they say what their powers shall be and what their obligations shall be. If the Government of the United States can step in and add to those obligations, may it not utterly destroy the municipality? If it can say that it shall be liable for damages occurring from a riot, . . . where [will] its power . . . stop and what obligations . . . might [it] not lay upon a municipality. . . .

"Now, only the other day, the Supreme Court . . . decided [in *Collector* v. *Day,* 11 Wall. 113 (1871)] that there is no power in the Government of the United States, under its authority to tax, to tax the salary of a State officer. Why? Simply because the power to tax involves the power to destroy, and it was not the intent to give the Government of the United States power to destroy the government of the States in any respect. It was held also in the case of Prigg *vs.* Pennsylvania [16 Pet. 539 (1842)] that it is not within the power of the Congress of the United States to lay duties upon a State officer; that we cannot command a State officer to do any duty whatever, as such; and I ask . . . the difference between that and commanding a municipality, which is equally the creature of the State, to perform a duty." Globe 795.

Any attempt to impute a unitary constitutional theory to opponents of the Sherman amendment is, of course, fraught

with difficulties, not the least of which is that most Members of Congress did not speak to the issue of the constitutionality of the amendment. Nonetheless, two considerations lead us to conclude that opponents of the Sherman amendment found it unconstitutional substantially because of the reasons stated by Representative Blair: First, Blair's analysis is precisely that of Poland, whose views were quoted as authoritative in *Monroe,* see *supra,* at 664, and that analysis was shared in large part by all House opponents who addressed the constitutionality of the Sherman amendment.[31] Second, Blair's exegesis of the reigning constitutional theory of his day, as we shall explain, was clearly supported by precedent—albeit precedent that has not survived, see *Ex parte Virginia,* 100 U. S. 339, 347–348 (1880); *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 486 (1939)—and no other constitutional formula was advanced by participants in the House debates.

*Collector* v. *Day,* cited by Blair, was the clearest and, at the time of the debates, the most recent pronouncement of a doctrine of coordinate sovereignty that, as Blair stated, placed limits on even the enumerated powers of the National Government in favor of protecting state prerogatives. There, the Court held that the United States could not tax the income of Day, a Massachusetts state judge, because the independence of the States within their legitimate spheres would be imperiled if the instrumentalities through which States executed their powers were "subject to the control of another and distinct government." 11 Wall., at 127. Although the Court in *Day* apparently rested this holding in part on the proposition that the taxing "power acknowledges no limits but the will of the legislative body imposing the tax," *id.,* at 125–126; cf. *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), the Court had in other cases limited other national powers in order to avoid interference with the States.[32]

---

[31] See n. 30, *supra.*

[32] In addition to the cases discussed in the text, see *Lane County* v. *Ore-*

In *Prigg* v. *Pennsylvania,* for example, Mr. Justice Story, in addition to confirming a broad national power to legislate under the Fugitive Slave Clause, see *supra,* at 672, held that Congress could not "insist that states . . . provide means to carry into effect the duties of the national government." 16 Pet., at 615–616.[33] And Mr. Justice McLean agreed that, "[a]s a general principle," it was true "that Congress had no power to impose duties on state officers, as provided in the [Act of Feb. 12, 1793]." Nonetheless he wondered whether Congress might not impose "positive" duties on state officers where a clause of the Constitution, like the Fugitive Slave Clause, seemed to require affirmative government assistance, rather than restraint of government, to secure federal rights. See *id.,* at 664–665.

Had Mr. Justice McLean been correct in his suggestion that, where the Constitution envisioned affirmative government assistance, the States or their officers or instrumentalities could be required to provide it, there would have been little doubt that Congress could have insisted that municipalities afford by "positive" action the protection [34] owed individuals under § 1 of the Fourteenth Amendment whether or not municipalities were obligated by state law to keep the peace. However, any such argument, largely foreclosed by *Prigg,* was made

---

*gon,* 7 Wall. 71, 77, 81 (1869), in which the Court held that the federal Legal Tender Acts should not be construed to require the States to accept taxes tendered in United States notes since this might interfere with a legitimate state activity.

[33] Mr. Chief Justice Taney agreed:

"The state officers mentioned in the law [of 1793] are not bound to execute the duties imposed upon them by Congress, unless they choose to do so, or are required to do so by a law of the state; and the state legislature has the power, if it thinks proper, to prohibit them. The act of 1793, therefore, must depend altogether for its execution upon the officers of the United States named in it." 16 Pet., at 630 (concurring in part).

[34] See *supra,* at 670, and n. 21.

impossible by the Court's holding in *Kentucky* v. *Dennison*, 24 How. 66 (1861). There, the Court was asked to require Dennison, the Governor of Ohio, to hand over Lago, a fugitive from justice wanted in Kentucky, as required by § 1 of the Act of Feb. 12, 1793,[35] which implemented Art. IV, § 2, cl. 2, of the Constitution. Mr. Chief Justice Taney, writing for a unanimous Court, refused to enforce that section of the Act:

> "[W]e think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it; for if it possessed this power, it might overload the officer with duties which would fill up all his time, and disable him from performing his obligations to the State, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State." 24 How., at 107–108.

The rationale of *Dennison*—that the Nation could not impose duties on state officers since that might impede States in their legitimate activities—is obviously identical to that which animated the decision in *Collector* v. *Day.* See *supra,* at 676. And, as Blair indicated, municipalities as instrumentalities through which States executed their policies could be equally disabled from carrying out state policies if they were also obligated to carry out federally imposed duties. Although no one cited *Dennison* by name, the principle for which it

---

[35] *"Be it enacted* . . . That whenever the executive authority of any state in the Union . . . shall demand any person as a fugitive from justice . . . and shall moreover produce the copy of an indictment found . . . charging the person so demanded, with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the state . . . from whence the person so charged fled, it shall be the duty of the executive authority of the state or territory to which such person shall have fled, to cause him or her to be arrested and secured . . . and to cause the fugitive to be delivered to such agent [of the demanding State] when he shall appear . . . ." 1 Stat. 302.

stands was well known to Members of Congress,[36] many of whom discussed *Day*[37] as well as a series of State Supreme Court cases[38] in the mid-1860's which had invalidated a federal tax on the process of state courts on the ground that the tax threatened the independence of a vital state function.[39] Thus, there was ample support for Blair's view that the Sherman amendment, by putting municipalities to the Hobson's choice of keeping the peace or paying civil damages, attempted to impose obligations on municipalities by indirection that could not be imposed directly, thereby threatening to "destroy the government of the States." Globe 795.

If municipal liability under § 1 of the Civil Rights Act of 1871 created a similar Hobson's choice, we might conclude, as *Monroe* did, that Congress could not have intended municipalities to be among the "persons" to which that section applied. But this is not the case.

First, opponents expressly distinguished between imposing an obligation to keep the peace and merely imposing civil liability for damages on a municipality that was obligated by state law to keep the peace, but which had not in violation of the Fourteenth Amendment. Representative Poland, for example, reasoning from Contract Clause precedents, indicated that Congress could constitutionally confer jurisdiction on the federal courts to entertain suits seeking to hold municipalities

---

[36] "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Globe 799 (Rep. Farnsworth). See also *id.*, at 788–789 (Rep. Kerr).

[37] See, *e. g., id.*, at 764 (Sen. Davis); *ibid.* (Sen. Casserly); *id.*, at 772 (Sen. Thurman) (reciting logic of *Day*); *id.*, at 777 (Sen. Frelinghuysen); *id.*, at 788–789 (Rep. Kerr) (reciting logic of *Day*); *id.*, at 793 (Rep. Poland); *id.*, at 799 (Rep. Farnsworth) (also reciting logic of *Day*).

[38] *Warren* v. *Paul,* 22 Ind. 276 (1864); *Jones* v. *Estate of Keep,* 19 Wis. 369 (1865); *Fifield* v. *Close,* 15 Mich. 505 (1867); *Union Bank* v. *Hill,* 43 Tenn. 325 (1866); *Smith* v. *Short,* 40 Ala. 385 (1867).

[39] See Globe 764 (Sen. Davis); *ibid.* (Sen. Casserly). See also T. Cooley, Constitutional Limitations *483–*484 (1871 ed.).

liable for using their authorized powers in violation of the Constitution—which is as far as § 1 of the Civil Rights Act went:

> "I presume . . . that where a State had imposed a duty [to keep the peace] upon [a] municipality . . . an action would be allowed to be maintained against them in the courts of the United States under the ordinary restrictions as to jurisdiction. But the enforcing a liability, existing by their own contract, or by a State law, in the courts, is a very widely different thing from devolving a new duty or liability upon them by the national Government, which has no power either to create or destroy them, and no power or control over them whatever." Globe 794.

Representative Burchard agreed:

> "[T]here is no duty imposed by the Constitution of the United States, or usually by State laws, upon a county to protect the people of that county against the commission of the offenses herein enumerated, such as the burning of buildings or any other injury to property or injury to person. Police powers are not conferred upon counties as corporations; they are conferred upon cities that have qualified legislative power. And so far as cities are concerned, where the equal protection required to be afforded by a State is imposed upon a city by State laws, perhaps the United States courts could enforce its performance. But counties . . . do not have any control of the police . . . ." Id., at 795.

See also the views of Rep. Willard, discussed at n. 30, supra.

Second, the doctrine of dual sovereignty apparently put no limit on the power of federal courts to enforce the Constitution against municipalities that violated it. Under the theory of dual sovereignty set out in Prigg, this is quite understandable. So long as federal courts were vindicating the Federal Constitution, they were providing the "positive" government action

required to protect federal constitutional rights and no question was raised of enlisting the States in "positive" action. The limits of the principles announced in *Dennison* and *Day* are not so well defined in logic, but are clear as a matter of history. It must be remembered that the same Court which rendered *Day* also vigorously enforced the Contract Clause against municipalities—an enforcement effort which included various forms of "positive" relief, such as ordering that taxes be levied and collected to discharge federal-court judgments, once a constitutional infraction was found.[40] Thus, federal judicial enforcement of the Constitution's express limits on state power, since it was done so frequently, must, notwithstanding anything said in *Dennison* or *Day,* have been permissible, at least so long as the interpretation of the Constitution was left in the hands of the judiciary. Since § 1 of the Civil Rights Act simply conferred jurisdiction on the federal courts to enforce § 1 of the Fourteenth Amendment—a situation precisely analogous to the grant of diversity jurisdiction under which the Contract Clause was enforced against munici-

---

[40] See cases cited in n. 28, *supra.* Since this Court granted unquestionably "positive" relief in Contract Clause cases, it appears that the distinction between the Sherman amendment and those cases was not that the former created a positive obligation whereas the latter imposed only a negative restraint. Instead, the distinction must have been that a violation of the Constitution was the predicate for "positive" relief in the Contract Clause cases, whereas the Sherman amendment imposed damages without regard to whether a local government was in any way at fault for the breach of the peace for which it was to be held for damages. See *supra,* at 668. While no one stated this distinction expressly during the debates, the inference is strong that Congressmen in 1871 would have drawn this distinction since it explains why Representatives Poland, Burchard, and Willard, see *supra,* at 680, could oppose the amendment while at the same time saying that the Federal Government might impose damages on a local government that had defaulted in a state-imposed duty to keep the peace, and it also explains why everyone agreed that a state or municipal officer could constitutionally be held liable under § 1 for violations of the Constitution. See *infra,* at 682–683.

palities—there is no reason to suppose that opponents of the Sherman amendment would have found any constitutional barrier to § 1 suits against municipalities.

Finally, the very votes of those Members of Congress, who opposed the Sherman amendment but who had voted for § 1, confirm that the liability imposed by § 1 was something very different from that imposed by the amendment. Section 1 without question could be used to obtain a damages judgment against state or municipal *officials* who violated federal constitutional rights while acting under color of law.[41] However, for *Prigg-Dennison-Day* purposes, as Blair and others recognized,[42] there was no distinction of constitutional magnitude between officers and agents—including corporate agents—of the State: Both were state instrumentalities and the State could be impeded no matter over which sort of instrumentality the Federal Government sought to assert its power. *Dennison* and *Day*, after all, were not suits against municipalities but against *officers,* and Blair was quite conscious that he was extending these cases by applying them to municipal corporations.[43] Nonetheless, Senator Thurman, who gave the most exhaustive critique of § 1—*inter alia,* complaining that it would be applied to state officers, see Globe App. 217—and who opposed both § 1 and the Sherman amendment, the latter on *Prigg* grounds, agreed unequivocally that § 1 was constitu-

---

[41] See, *e. g.,* Globe 334 (Rep. Hoar); *id.,* at 365 (Rep. Arthur); *id.,* at 367–368 (Rep. Sheldon); *id.,* at 385 (Rep. Lewis); Globe App. 217 (Sen. Thurman). In addition, officers were included among those who could be sued under the second conference substitute for the Sherman amendment. See Globe 805 (exchange between Rep. Willard and Rep. Shellabarger). There were no constitutional objections to the second report.

[42] See *id.,* at 795 (Rep. Blair); *id.,* at 788 (Rep. Kerr); *id.,* at 795 (Rep. Burchard); *id.,* at 799 (Rep. Farnsworth).

[43] "[W]e cannot command a State officer to do any duty whatever, as such; and I ask . . . the difference between that and commanding a municipality . . . ." *Id.,* at 795.

tional.[44] Those who voted for § 1 must similarly have believed in its constitutionality despite *Prigg, Dennison,* and *Day*.

## C. Debate on § 1 of the Civil Rights Bill

From the foregoing discussion, it is readily apparent that nothing said in debate on the Sherman amendment would have prevented holding a municipality liable under § 1 of the Civil Rights Act for its own violations of the Fourteenth Amendment. The question remains, however, whether the general language describing those to be liable under § 1—"any person"—covers more than natural persons. An examination of the debate on § 1 and application of appropriate rules of construction show unequivocally that § 1 was intended to cover legal as well as natural persons.

Representative Shellabarger was the first to explain the function of § 1:

> "[Section 1] not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." Globe App. 68.

By extending a remedy to all people, including whites, § 1 went beyond the mischief to which the remaining sections of the 1871 Act were addressed. Representative Shellabarger also stated without reservation that the constitutionality of § 2 of the Civil Rights Act of 1866 controlled the constitutionality of § 1 of the 1871 Act, and that the former had been

---

[44] See Globe App. 216–217, quoted in n. 45, *infra*. In 1880, moreover, when the question of the limits of the *Prigg* principle was squarely presented in *Ex parte Virginia*, 100 U. S. 339, this Court held that *Dennison* and *Day* and the principle of federalism for which they stand did not prohibit federal enforcement of § 5 of the Fourteenth Amendment through suits directed to state officers. See 100 U. S., at 345–348.

approved by "the supreme courts of at least three States of this Union" and by Mr. Justice Swayne, sitting on circuit, who had concluded: " 'We have no doubt of the constitutionality of every provision of this act.' " Globe App. 68. Representative Shellabarger then went on to describe how the courts would and should interpret § 1:

> "This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation. As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people. . . . Chief Justice Jay and also Story say:
> " 'Where a power is remedial in its nature there is much reason to contend that it ought to be construed liberally, and it is generally adopted in the interpretation of laws.'—1 *Story on Constitution,* sec. 429." Globe App., at 68.

The sentiments expressed in Representative Shellabarger's opening speech were echoed by Senator Edmunds, the manager of H. R. 320 in the Senate:

> "The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill [of 1866], which have since become a part of the Constitution." Globe 568.

"[Section 1 is] so very simple and really reënact[s] the Constitution." *Id.*, at 569.

And he agreed that the bill "secure[d] the rights of white men as much as of colored men." *Id.*, at 696.

In both Houses, statements of the supporters of § 1 corroborated that Congress, in enacting § 1, intended to give a broad remedy for violations of federally protected civil rights.[45] Moreover, since municipalities through their official

---

[45] Representative Bingham, the author of § 1 of the Fourteenth Amendment, for example, declared the bill's purpose to be "the enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . to the extent of the rights guarantied to him by the Constitution." Globe App. 81. He continued:

"The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws . . . . [And] the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. . . . They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy. . . . Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in the States and by States, or combinations of persons?" *Id.*, at 85.

Representative Perry, commenting on Congress' action in passing the civil rights bill also stated:

"Now, by our action on this bill we have asserted as fully as we can assert the mischief intended to be remedied. We have asserted as clearly as we can assert our belief that it is the duty of Congress to redress that mischief. We have also asserted as fully as we can assert the constitutional right of Congress to legislate." Globe 800.

See also *id.*, at 376 (Rep. Lowe); *id.*, at 428–429 (Rep. Beatty); *id.*, at 448 (Rep. Butler); *id.*, at 475–477 (Rep. Dawes); *id.*, at 578–579 (Sen. Trumbull); *id.*, at 609 (Sen. Pool); Globe App. 182 (Rep. Mercur).

Other supporters were quite clear that § 1 of the Act extended a remedy not only where a State had passed an unconstitutional statute, but also

acts could, equally with natural persons, create the harms intended to be remedied by § 1, and, further, since Congress intended § 1 to be broadly construed, there is no reason to suppose that municipal corporations would have been excluded from the sweep of § 1. Cf., *e. g., Ex parte Virginia,* 100 U. S. 339, 346–347 (1880); *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, 286–287, 294–296 (1913). One need not rely on this inference alone, however, for the debates show that Members of Congress understood "persons" to include municipal corporations.

Representative Bingham, for example, in discussing § 1 of the bill, explained that he had drafted § 1 of the Fourteenth Amendment with the case of *Barron* v. *Mayor of Baltimore,* 7 Pet. 243 (1833), especially in mind. "In [that] case the

---

where officers of the State were deliberately indifferent to the rights of black citizens:

"But the chief complaint is . . . [that] by a systematic maladministration of [state law], or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them. Whenever such a state of facts is clearly made out, I believe [§ 5 of the Fourteenth Amendment] empowers Congress to step in and provide for doing justice to those persons who are thus denied equal protection." *Id.,* at 153 (Rep. Garfield). See also *Monroe* v. *Pape,* 365 U. S., at 171–187.

Importantly for our inquiry, even the opponents of § 1 agreed that it was constitutional and, further, that it swept very broadly. Thus, Senator Thurman, who gave the most exhaustive critique of § 1, said:

"This section relates wholly to civil suits. . . . Its whole effect is to give to the Federal Judiciary that which now does not belong to it—*a jurisdiction that may be constitutionally conferred upon it, I grant,* but that has never yet been conferred upon it. It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. . . .

　　·　　　　·　　　　·　　　　·　　　　·

"[T]*here is no limitation whatsoever upon the terms that are employed* [*in the bill*], *and they are as comprehensive as can be used.*" Globe App. 216–217 (emphasis added).

*city* had taken private property for public use, without compensation . . . , and there was no redress for the wrong . . . ." Globe App. 84 (emphasis added). Bingham's further remarks clearly indicate his view that such takings by cities, as had occurred in *Barron,* would be redressable under § 1 of the bill. See Globe App. 85. More generally, and as Bingham's remarks confirm, § 1 of the bill would logically be the vehicle by which Congress provided redress for takings, since that section provided the only civil remedy for Fourteenth Amendment violations and that Amendment unequivocally prohibited uncompensated takings.[46] Given this purpose, it beggars reason to suppose that Congress would have exempted municipalities from suit, insisting instead that compensation for a taking come from an officer in his individual capacity rather than from the government unit that had the benefit of the property taken.[47]

In addition, by 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis. This had not always been so. When this Court first considered the question of the status of corporations, Mr. Chief Justice Marshall, writing for the Court, denied that corporations "as such" were persons as that term was used in Art. III and the Judiciary Act of 1789. See *Bank of the United States* v. *Deveaux,* 5 Cranch 61, 86 (1809).[48] By 1844, however, the *Deveaux* doctrine was unhesitatingly abandoned:

"[A] corporation created by and doing business in a par-

---

[46] See 2 J. Story, Commentaries on the Constitution of the United States § 1956 (T. Cooley ed. 1873).

[47] Indeed the federal courts found no obstacle to awards of damages against municipalities for common-law takings. See *Sumner* v. *Philadelphia,* 23 F. Cas. 392 (No. 13,611) (CC ED Pa. 1873) (awarding damages of $2,273.36 and costs of $346.35 against the city of Philadelphia).

[48] Nonetheless, suits could be brought in federal court if the natural persons who were members of the corporation were of diverse citizenship from the other parties to the litigation. See 5 Cranch, at 91.

ticular state, is to be deemed *to all intents and purposes as a person,* although an artificial person, . . . capable of being treated as a citizen of that state, as much as a natural person." *Louisville R. Co.* v. *Letson,* 2 How. 497, 558 (1844) (emphasis added), discussed in Globe 752.

And only two years before the debates on the Civil Rights Act, in *Cowles* v. *Mercer County,* 7 Wall. 118, 121 (1869), the *Letson* principle was automatically and without discussion extended to municipal corporations. Under this doctrine, municipal corporations were routinely sued in the federal courts [49] and this fact was well known to Members of Congress.[50]

That the "usual" meaning of the word "person" would extend to municipal corporations is also evidenced by an Act of Congress which had been passed only months before the Civil Rights Act was passed. This Act provided that

"in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

Municipal corporations in 1871 were included within the phrase "bodies politic and corporate" [51] and, accordingly, the

---

[49] See n. 28, *supra.*

[50] See, *e. g.,* Globe 777 (Sen. Sherman); *id.,* at 752 (Rep. Shellabarger) ("[C]ounties, cities, and corporations of all sorts, after years of judicial conflict, have become thoroughly established to be an individual or person or entity of the personal existence, of which, as a citizen, individual, or inhabitant, the United States Constitution does take note and endow with faculty to sue and be sued in the courts of the United States").

[51] See *Northwestern Fertilizing Co.* v. *Hyde Park,* 18 F. Cas. 393, 394 (No. 10,336) (CC ND Ill. 1873); 2 J. Kent, Commentaries on American Law *278–*279 (12th O. W. Holmes ed. 1873). See also *United States* v. *Maurice,* 2 Brock. 96, 109 (CC Va. 1823) (Marshall, C. J.) ("The United States is a government, and, consequently, a body politic and corporate"); Apps. D and E to Brief for Petitioners in *Monroe* v. *Pape,* O. T. 1960,

"plain meaning" of § 1 is that local government bodies were to be included within the ambit of the persons who could be sued under § 1 of the Civil Rights Act. Indeed, a Circuit Judge, writing in 1873 in what is apparently the first reported case under § 1, read the Dictionary Act in precisely this way in a case involving a corporate plaintiff and a municipal defendant.[52] See *Northwestern Fertilizing Co.* v. *Hyde Park,* 18 F. Cas. 393, 394 (No. 10,336) (CC ND Ill. 1873).[53]

No. 39 (collecting state statutes which, in 1871, defined municipal corporations as bodies politic and corporate).

[52] The court also noted that there was no discernible reason why persons injured by municipal corporations should not be able to recover. See 18 F. Cas., at 394.

[53] In considering the effect of the Act of Feb. 25, 1871, in *Monroe,* however, Mr. Justice Douglas, apparently focusing on the word "may," stated: "[T]his definition [of person] is merely an allowable, not a mandatory, one." 365 U. S., at 191. A review of the legislative history of the Dictionary Act shows this conclusion to be incorrect.

There is no express reference in the legislative history to the definition of "person," but Senator Trumbull, the Act's sponsor, discussed the phrase "words importing the masculine gender *may* be applied to. females," (emphasis added), which immediately precedes the definition of "person," and stated:

"The only object [of the Act] is to get rid of a great deal of verbosity in our statutes by providing that when the word 'he' is used it *shall* include females as well as males." Cong. Globe, 41st Cong., 3d Sess., 775 (1871) (emphasis added).

Thus, in Trumbull's view the word "may" meant "shall." Such a mandatory use of the extended meanings of the words defined by the Act is also required for it to perform its intended function—to be a guide to "rules of construction" of Acts of Congress. See *ibid.* (remarks of Sen. Trumbull). Were the defined words "allowable, [but] not mandatory" constructions, as *Monroe* suggests, there would be no "rules" at all. Instead, Congress must have intended the definitions of the Act to apply across-the-board except where the Act by its terms called for a deviation from this practice—"[where] the context shows that [defined] words were to be used in a more limited sense." Certainly this is how the *Northwestern Fertilizing* court viewed the matter. Since there is nothing in the "context" of § 1 of the Civil Rights Act calling for a restricted

## II

Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.[54] Local governing bodies,[55] therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitu-

---

interpretation of the word "person," the language of that section should prima facie be construed to include "bodies politic" among the entities that could be sued.

[54] There is certainly no constitutional impediment to municipal liability. "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." *Milliken* v. *Bradley*, 433 U. S. 267, 291 (1977); see *Ex parte Virginia*, 100 U. S., at 347–348. For this reason, *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), is irrelevant to our consideration of this case. Nor is there any basis for concluding that the Eleventh Amendment is a bar to municipal liability. See, *e. g.*, *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976); *Lincoln County* v. *Luning*, 133 U. S. 529, 530 (1890). Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.

[55] Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis— our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

tional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 167–168 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." [56]

On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

We begin with the language of § 1983 as originally passed:

> "[A]*ny person who,* under color of any law, statute, ordinance, regulation, custom, or usage of any State, *shall subject, or cause to be subjected,* any person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such

---

[56] See also Mr. Justice Frankfurter's statement for the Court in *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369 (1940):

"It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice . . . can establish what is state law. The Equal Protection Clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text."

law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . ." 17 Stat. 13 (emphasis added).

The italicized language plainly imposes liability on a government that, under color of some official policy, "causes" an employee to violate another's constitutional rights. At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B "caused" A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.[57] See *Rizzo* v. *Goode*, 423 U. S. 362, 370–371 (1976).

---

[57] Support for such a conclusion can be found in the legislative history. As we have indicated, there is virtually no discussion of § 1 of the Civil Rights Act. Again, however, Congress' treatment of the Sherman amendment gives a clue to whether it would have desired to impose *respondeat superior* liability.

The primary constitutional justification for the Sherman amendment was that it was a necessary and proper remedy for the failure of localities to protect citizens as the Privileges or Immunities Clause of the Fourteenth Amendment required. See *supra*, at 670–673. And according to Sherman, Shellabarger, and Edmunds, the amendment came into play only when a locality was at fault or had knowingly neglected its duty to provide protection. See Globe 761 (Sen. Sherman); *id.*, at 756 (Sen. Edmunds); *id.*, at 751–752 (Rep. Shellabarger). But other proponents of the amendment apparently viewed it as a form of vicarious liability for the unlawful acts of the citizens of the locality. See *id.*, at 792 (Rep. Butler). And whether intended or not, the amendment as drafted did impose a species of vicarious liability on municipalities since it could be construed to impose liability even if a municipality did not know of an impending or ensuing riot or did not have the wherewithal to do anything about it. Indeed, the amendment held a municipality liable even if it had done everything in its

Equally important, creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with the obligation to keep the peace, an obligation Congress chose not to impose because it thought imposition of such an obligation unconstitutional. To this day, there is disagreement about the basis for imposing liability on an employer for the torts of an employee when the sole nexus between the employer and the tort is the fact of the employer-employee relationship. See W. Prosser, Law of Torts § 69, p. 459 (4th ed. 1971). Nonetheless, two justifications tend to stand out. First is the common-sense notion that no matter how blameless an employer appears to be in an individual case, accidents might nonetheless be reduced if employers had to bear the cost of accidents. See, *e. g., ibid.;* 2 F. Harper & F. James, Law of Torts, § 26.3, pp. 1368–1369 (1956). Second is the argument that the cost of accidents should be

---

power to curb the riot. See *supra,* at 668; Globe 761 (Sen. Stevenson); *id.,* at 771 (Sen. Thurman); *id.,* at 788 (Rep. Kerr); *id.,* at 791 (Rep. Willard). While the first conference substitute was rejected principally on constitutional grounds, see *id.,* at 804 (Rep. Poland), it is plain from the text of the second conference substitute—which limited liability to those who, having the power to intervene against Ku Klux Klan violence, "neglect[ed] or refuse[d] so to do," see Appendix to this opinion, *infra,* at 704, and which was enacted as § 6 of the 1871 Act and is now codified as 42 U. S. C. § 1986—that Congress also rejected those elements of vicarious liability contained in the first conference substitute even while accepting the basic principle that the inhabitants of a community were bound to provide protection against the Ku Klux Klan. Strictly speaking, of course, the fact that Congress refused to impose vicarious liability for the wrongs of a few private citizens does not conclusively establish that it would similarly have refused to impose vicarious liability for the torts of a municipality's employees. Nonetheless, when Congress' rejection of the only form of vicarious liability presented to it is combined with the absence of any language in § 1983 which can easily be construed to create *respondeat superior* liability, the inference that Congress did not intend to impose such liability is quite strong.

spread to the community as a whole on an insurance theory. See, *e. g., id.,* § 26.5; Prosser, *supra,* at 459.[58]

The first justification is of the same sort that was offered for statutes like the Sherman amendment: "The obligation to make compensation for injury resulting from riot is, by arbitrary enactment of statutes, affirmatory law, and the reason of passing the statute is to secure a more perfect police regulation." Globe 777 (Sen. Frelinghuysen). This justification was obviously insufficient to sustain the amendment against perceived constitutional difficulties and there is no reason to suppose that a more general liability imposed for a similar reason would have been thought less constitutionally objectionable. The second justification was similarly put forward as a justification for the Sherman amendment: "we do not look upon [the Sherman amendment] as a punishment . . . . It is a mutual insurance." *Id.,* at 792 (Rep. Butler). Again, this justification was insufficient to sustain the amendment.

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see *supra,* at

---

[58] A third justification, often cited but which on examination is apparently insufficient to justify the doctrine of *respondeat superior,* see, *e. g.,* 2 F. Harper & F. James, § 26.3, is that liability follows the right to control the actions of a tortfeasor. By our decision in *Rizzo v. Goode,* 423 U. S. 362 (1976), we would appear to have decided that the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability. See 423 U. S., at 370–371.

660–662, and n. 2, we must reverse the judgment below. In so doing, we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day.

### III

Although we have stated that *stare decisis* has more force in statutory analysis than in constitutional adjudication because, in the former situation, Congress can correct our mistakes through legislation, see, *e. g., Edelman* v. *Jordan*, 415 U. S. 651, 671, and n. 14 (1974), we have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes. See, *e. g., Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 47–49 (1977); *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 n. 1 (1932) (Brandeis, J., dissenting) (collecting cases). Nor is this a case where we should "place on the shoulders of Congress the burden of the Court's own error." *Girouard* v. *United States*, 328 U. S. 61, 70 (1946).

First, *Monroe* v. *Pape,* insofar as it completely immunizes municipalities from suit under § 1983, was a departure from prior practice. See, *e. g., Northwestern Fertilizing Co.* v. *Hyde Park*, 18 F. Cas. 393 (No. 10,336) (CC ND Ill. 1873); *City of Manchester* v. *Leiby*, 117 F. 2d 661 (CA1 1941); *Hannan* v. *City of Haverhill*, 120 F. 2d 87 (CA1 1941); *Douglas* v. *City of Jeannette*, 319 U. S. 157 (1943); *Holmes* v. *Atlanta*, 350 U. S. 879 (1955), in each of which municipalities were defendants in § 1983 suits.[59] Moreover, the constitutional de-

---

[59] Each case cited by *Monroe,* see 365 U. S., at 191 n. 50, as consistent with the position that local governments were not § 1983 "persons" reached its conclusion by assuming that state-law immunities overrode the § 1983 cause of action. This has never been the law.

fect that led to the rejection of the Sherman amendment would not have distinguished between municipalities and school boards, each of which is an instrumentality of state administration. See *supra,* at 673–682. For this reason, our cases—decided both before and after *Monroe,* see n. 5, *supra*—holding school boards liable in § 1983 actions are inconsistent with *Monroe,* especially as *Monroe's* immunizing principle was extended to suits for injunctive relief in *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973).[60] And although in many of these cases jurisdiction was not questioned, we ought not "disregard the implications of an exercise of judicial authority assumed to be proper for [100] years." *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 307 (1962); see *Bank of the United States* v. *Deveaux,* 5 Cranch, at 88 (Marshall, C. J.) ("Those decisions are not cited as authority . . . but they have much weight, as they show that this point neither occurred to the bar or the bench"). Thus, while we have reaffirmed *Monroe* without further examination on three occasions,[61] it can scarcely be said that *Monroe* is so consistent with the warp and woof of civil rights law as to be beyond question.

Second, the principle of blanket immunity established in *Monroe* cannot be cabined short of school boards. Yet such an extension would itself be inconsistent with recent expressions of congressional intent. In the wake of our decisions, Congress not only has shown no hostility to federal-court decisions against school boards, but it has indeed rejected efforts to strip the federal courts of jurisdiction over school boards.[62] Moreover, recognizing that school boards are often

---

[60] Although many suits against school boards also include private individuals as parties, the "principal defendant is usually the local board of education or school board." *Milliken* v. *Bradley,* 433 U. S., at 292–293 (POWELL, J., concurring in judgment).

[61] *Moor* v. *County of Alameda,* 411 U. S. 693 (1973); *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973); *Aldinger* v. *Howard,* 427 U. S. 1 (1976).

[62] During the heyday of the furor over busing, both the House and the

defendants in school desegregation suits, which have almost without exception been § 1983 suits, Congress has twice passed legislation authorizing grants to school boards to assist them in complying with federal-court decrees.[63] Finally, in

Senate refused to adopt bills that would have removed from the federal courts jurisdiction

"to make any decision, enter any judgment, or issue any order requiring any *school board* to make any change in the racial composition of the student body at any public school or in any class at any public school to which students are assigned in conformity with a freedom of choice system, or requiring any *school board* to transport any students from one public school to another public school or from one place to another place or from one school district to another school district in order to effect a change in the racial composition of the student body at any school or place or in any school district, or denying to any student the right or privilege of attending any public school or class at any public school chosen by the parent of such student in conformity with a freedom of choice system, or requiring any *school board* to close any school and transfer the students from the closed school to any other school for the purpose of altering the racial composition of the student body at any public school, or precluding any *school board* from carrying into effect any provision of any contract between it and any member of the faculty of any public school it operates specifying the public school where the member of the faculty is to perform his or her duties under the contract." S. 1737, 93d Cong., 1st Sess., § 1207 (1973) (emphasis added).

Other bills designed either completely to remove the federal courts from the school desegregation controversy, S. 287, 93d Cong., 1st Sess. (1973), or to limit the ability of federal courts to subject school boards to remedial orders in desegregation cases, S. 619, 93d Cong., 1st Sess. (1973); S. 179, 93d Cong., 1st Sess., § 2 (a) (1973); H. R. 13534, 92d Cong., 2d Sess., § 1 (1972), have similarly failed.

[63] In 1972, spurred by a finding "that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access," 86 Stat. 354, 20 U. S. C. § 1601 (a) (1976 ed.), Congress passed the Emergency School Aid Act. Section 706 (a) (1) (A) (i) of that Act, 20 U. S. C. § 1605 (a) (1) (A) (i) (1976 ed.), authorizes the Assistant Secretary

"to make a grant to, or a contract with, *a local educational agency [w]hich is implementing a plan . . . which has been undertaken pursuant to a final*

regard to the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U. S. C. § 1988 (1976 ed.), which allows prevailing parties (in the discretion of the court) in § 1983 suits

---

*order issued by a court of the United States . . .* which requires the desegregation of minority group segregated children or faculty in the elementary and secondary schools of such agency, or otherwise requires the elimination or reduction of minority group isolation in such schools." (Emphasis added.)

A "local educational agency" is defined by 20 U. S. C. § 1619 (8) (1976 ed.) as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or a federally recognized Indian reservation, or such combination of school districts, or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools, or a combination of local educational agencies . . . ." Congress thus clearly recognized that school boards were often parties to federal school desegregation suits. In § 718 of the Act, 86 Stat. 369, 20 U. S. C. § 1617 (1976 ed.), Congress gave its explicit approval to the institution of federal desegregation suits against school boards—presumably under § 1983. Section 718 provides:

"Upon the entry of a final order *by a court of the United States against a local educational agency* . . . for discrimination on the basis of race, color, or national origin in violation of . . . the fourteenth amendment to the Constitution of the United States . . . the court . . . may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Emphasis added.)

Two years later in the Equal Educational Opportunities Act of 1974, Congress found that "the implementation of desegregation plans that require extensive student transportation has, in many cases, required *local educational agencies* to expend large amounts of funds, thereby depleting their financial resources . . . ." 20 U. S. C. § 1702 (a) (3) (1976 ed.). (Emphasis added.) Congress did not respond by declaring that school boards were not subject to suit under § 1983 or any other federal statute, "but simply [legislated] revised evidentiary standards and remedial priorities to be employed by the courts in deciding such cases." Brief for National Education Assn. et al. as *Amici Curiae* 15–16. Indeed, Congress expressly reiterated that a cause of action, cognizable in the federal courts, exists for discrimination in the public school context. 20 U. S. C. §§ 1703,

to obtain attorney's fees from the losing parties, the Senate stated:

> "[D]efendants in these cases are often State or local *bodies* or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, *in his official capacity,* from funds of his agency or under his control, or *from the State or local government (whether or not the agency or government is a named party)."* S. Rep. No. 94–1011, p. 5 (1976) (emphasis added; footnotes omitted).

Far from showing that Congress has relied on *Monroe,* therefore, events since 1961 show that Congress has refused to extend the benefits of *Monroe* to school boards and has attempted to allow awards of attorney's fees against local governments even though *Monroe, City of Kenosha* v. *Bruno,* and *Aldinger* v. *Howard,* 427 U. S. 1 (1976), have made the joinder of such governments impossible.[64]

Third, municipalities can assert no reliance claim which can

---

1706, 1708, 1710, 1718 (1976 ed.). The Act assumes that school boards will usually be the defendants in such suits. For example, § 211 of the Act, 88 Stat. 516, as set forth in 20 U. S. C. § 1710 (1976 ed.), provides:

"The Attorney General shall not institute a civil action under section 1706 of this title [which allows for suit by both private parties and the Attorney General to redress discrimination in public education] before he—

"(a) gives to the appropriate educational agency notice of the condition or conditions which, in his judgment, constitute a violation of part 2 [the prohibitions against discrimination in public education]." Section 219 of the Act, 20 U. S. C. § 1718 (1976 ed.), provides for the termination of court-ordered busing "if the court finds the defendant educational agency has satisfied the requirements of the fifth or fourteenth amendments to the Constitution, whichever is applicable, and will continue to be in compliance with the requirements thereof."

[64] Whether Congress' attempt is in fact effective is the subject of *Hutto* v. *Finney,* O. T. 1977, No. 76–1660, cert. granted, 434 U. S. 901, and therefore we express no view on it here.

support an absolute immunity. As Mr. Justice Frankfurter said in *Monroe,* "[t]his is not an area of commercial law in which, presumably, individuals may have arranged their affairs in reliance on the expected stability of decision." 365 U. S., at 221–222 (dissenting in part). Indeed, municipalities simply cannot "arrange their affairs" on an assumption that they can violate constitutional rights indefinitely since injunctive suits against local officials under § 1983 would prohibit any such arrangement. And it scarcely need be mentioned that nothing in *Monroe* encourages municipalities to violate constitutional rights or even suggests that such violations are anything other than completely wrong.

Finally, even under the most stringent test for the propriety of overruling a statutory decision proposed by Mr. Justice Harlan in *Monroe* [65]—"that it appear beyond doubt from the legislative history of the 1871 statute that [*Monroe*] misapprehended the meaning of the [section]," 365 U. S., at 192 (concurring opinion)—the overruling of *Monroe* insofar as it holds that local governments are not "persons" who may be defendants in § 1983 suits is clearly proper. It is simply beyond doubt that, under the 1871 Congress' view of the law, were § 1983 liability unconstitutional as to local governments, it would have been equally unconstitutional as to state officers. Yet everyone—proponents and opponents alike—knew § 1983 would be applied to state officers and nonetheless stated that § 1983 was constitutional. See *supra,* at 680–682. And, moreover, there can be no doubt that § 1 of the Civil Rights Act was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected

---

[65] We note, however, that Mr. Justice Harlan's test has not been expressly adopted by this Court. Moreover, that test is based on two factors: *stare decisis* and "indications of congressional acceptance of this Court's earlier interpretation [of the statute in question]." 365 U. S., at 192. As we have explained, the second consideration is not present in this case.

rights. Therefore, absent a clear statement in the legislative history supporting the conclusion that § 1 was not to apply to the official acts of a municipal corporation—which simply is not present—there is no justification for excluding municipalities from the "persons" covered by § 1.

For the reasons stated above, therefore, we hold that *stare decisis* does not bar our overruling of *Monroe* insofar as it is inconsistent with Parts I and II of this opinion.[66]

## IV

Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties or addressed by the courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 "be drained of meaning," *Scheuer* v. *Rhodes,* 416 U. S. 232, 248 (1974). Cf. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 397–398 (1971).

---

[66] No useful purpose would be served by an attempt at this late date to determine whether *Monroe* was correct on its facts. Similarly, since this case clearly involves official policy and does not involve *respondeat superior,* we do not assay a view on how our cases which have relied on that aspect of *Monroe* that is overruled today—*Moor* v. *County of Alameda,* 411 U. S. 693 (1973); *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973); and *Aldinger* v. *Howard,* 427 U. S. 1 (1976)—should have been decided on a correct view of § 1983. Nothing we say today affects the conclusion reached in *Moor,* see 411 U. S., at 703–704, that 42 U. S. C. § 1988 cannot be used to create a federal cause of action where § 1983 does not otherwise provide one, or the conclusion reached in *City of Kenosha,* see 412 U. S., at 513, that "nothing . . . suggest[s] that the generic word 'person' in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them."

## V

For the reasons stated above, the judgment of the Court of Appeals is

*Reversed.*

## APPENDIX TO OPINION OF THE COURT

As proposed, the Sherman amendment was as follows:

"That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the inhabitants of the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense if living, or to his widow or legal representative if dead; and such compensation may be recovered by such person or his representative by a suit in any court of the United States of competent jurisdiction in the district in which the offense was committed, to be in the name of the person injured, or his legal representative, and against said county, city, or parish. And execution may be issued on a judgment rendered in such suit and may be levied upon any property, real or personal, of any person in said county, city, or parish, and the said county, city, or parish may recover the full amount of such judgment, costs and interest,

from any person or persons engaged as principal or accessory in such riot in an action in any court of competent jurisdiction." Globe 663.

The complete text of the first conference substitute for the Sherman amendment is:

"That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together, with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense, if living, or to his widow or legal representative if dead; and such compensation may be recovered in an action on the case by such person or his representative in any court of the United States of competent jurisdiction in the district in which the offense was committed, such action to be in the name of the person injured, or his legal representative, and against said county, city, or parish, and in which action any of the parties committing such acts may be joined as defendants. And any payment of any judgment, or part thereof unsatisfied, recovered by the plaintiff in such action, may, if not satisfied by the individual defendant therein within two months next after the recovery of such judgment upon execution duly issued against such individual defendant in such judgment, and returned unsatisfied, in whole or in part, be enforced

against such county, city, or parish, by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment shall be a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof. And the court in any such action may on motion cause additional parties to be made therein prior to issue joined, to the end that justice may be done. And the said county, city, or parish may recover the full amount of such judgment, by it paid, with costs and interest, from any person or persons engaged as principal or accessory in such riot, in an action in any court of competent jurisdiction. And such county, city, or parish, so paying, shall also be subrogated to all the plaintiff's rights under such judgment." *Id.,* at 749, 755.

The relevant text of the second conference substitute for the Sherman amendment is as follows:

"[A]ny person or persons having knowledge that any of the wrongs conspired to be done and mentioned in the second section of this act are about to be committed, and having power to prevent or aid in preventing the same, *shall neglect or refuse so to do,* and such wrongful act shall be committed, such person or persons shall be liable to the person injured, or his legal representatives." *Id.,* at 804 (emphasis added).

MR. JUSTICE POWELL, concurring.

I join the opinion of the Court, and express these additional views.

Few cases in the history of the Court have been cited more frequently than *Monroe* v. *Pape,* 365 U. S. 167 (1961), decided less than two decades ago. Focusing new light on 42 U. S. C. § 1983, that decision widened access to the federal courts and permitted expansive interpretations of the reach of

the 1871 measure. But *Monroe* exempted local governments from liability at the same time it opened wide the courthouse door to suits against officers and employees of those entities— even when they act pursuant to express authorization. The oddness of this result, and the weakness of the historical evidence relied on by the *Monroe* Court in support of it, are well demonstrated by the Court's opinion today. Yet the gravity of overruling a part of so important a decision prompts me to write.

I

In addressing a complaint alleging unconstitutional police conduct that probably was unauthorized and actionable under state law,[1] the *Monroe* Court treated the 42d Congress' rejection of the Sherman amendment as conclusive evidence of an intention to immunize local governments from all liability under the statute for constitutional injury. That reading, in light of today's thorough canvass of the legislative history, clearly "misapprehended the meaning of the controlling provision," *Monroe, supra,* at 192 (Harlan, J., concurring). In this case, involving formal, written policies of the Department of Social Services and the Board of Education of the city of New York that are alleged to conflict

---

[1] The gravamen of the complaint in *Monroe* was that Chicago police officers acting "under color of" state law had conducted a warrantless, early morning raid and ransacking of a private home. Although at least one of the allegations in the complaint could have been construed to charge a custom or usage of the Police Department of the city of Chicago that did not violate state law, see 365 U. S., at 258–259 (Frankfurter, J., dissenting in part), and there is a hint of such a theory in Brief for Petitioners, O. T. 1960, No. 39, pp. 41–42, that feature of the case was not highlighted in this Court. The dispute that divided the Court was over whether a complaint alleging police misconduct in violation of state law, for which state judicial remedies were available, stated a § 1983 claim in light of the statutory requirement that the conduct working injury be "under color of" state law. Compare 365 U. S., at 172–183 (opinion of the Court), and *id.,* at 193–202 (Harlan, J., concurring), with *id.,* at 202–259 (Frankfurter, J., dissenting in part).

with the command of the Due Process Clause, cf. *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974), the Court decides "not to reject [wisdom] merely because it comes late," *Henslee* v. *Union Planters Bank,* 335 U. S. 595, 600 (1949) (Frankfurter, J., dissenting).

As the Court demonstrates, the Sherman amendment presented an extreme example of "riot act" legislation that sought to impose vicarious liability on government subdivisions for the consequences of private lawlessness. As such, it implicated concerns that are of marginal pertinence to the operative principle of § 1 of the 1871 legislation—now § 1983—that "any person" acting "under color of" state law may be held liable for affirmative conduct that "subjects, or causes to be subjected, any person . . . to the deprivation of any" federal constitutional or statutory right. Of the many reasons for the defeat of the Sherman proposal, none supports *Monroe*'s observation that the 42d Congress was fundamentally "antagonistic," 365 U. S., at 191, to the proposition that government entities and natural persons alike should be held accountable for the consequences of conduct directly working a constitutional violation. Opponents in the Senate appear to have been troubled primarily by the proposal's unprecedented lien provision, which would have exposed even property held for public purposes to the demands of § 1983 judgment lienors. *Ante,* at 673–674, n. 30. The opposition in the House of Representatives focused largely on the Sherman amendment's attempt to impose a peacekeeping obligation on municipalities when the Constitution itself imposed no such affirmative duty and when many municipalities were not even empowered under state law to maintain police forces. *Ante,* at 673–675, 679–682.[2]

---

[2] If in the view of House opponents, such as Representatives Poland, Burchard, and Willard, see *ante,* at 679–680, a municipality obligated by state law to keep the peace could be held liable for a failure to provide equal protection against private violence, it seems improbable that they would have opposed imposition of liability on a municipality for the

The Court correctly rejects a view of the legislative history that would produce the anomalous result of immunizing local government units from monetary liability for action directly causing a constitutional deprivation, even though such actions may be fully consistent with, and thus not remediable under, state law. No conduct of government comes more clearly within the "under color of" state law language of § 1983. It is most unlikely that Congress intended public officials acting under the command or the specific authorization of the government employer to be *exclusively* liable for resulting constitutional injury.[3]

As elaborated in Part II of today's opinion, the rejection of the Sherman amendment can best be understood not as evidence of Congress' acceptance of a rule of absolute municipal immunity but as a limitation of the statutory ambit to actual wrongdoers, *i. e.*, a rejection of *respondeat superior* or any other principle of vicarious liability. Cf. Levin, The Section 1983 Municipal Immunity Doctrine, 65 Geo. L. J. 1483, 1531–1535 (1977). Thus, it has been clear that a public official may be held liable in damages when his actions are found to violate a constitutional right and there is no qualified immunity, see *Wood* v. *Strickland,* 420 U. S. 308 (1975); *Procunier* v. *Navarette,* 434 U. S. 555 (1978). Today the Court recognizes

affirmative implementation of policies promulgated within its proper sphere of operation under state law. Such liability is premised not on a failure to take affirmative action in an area outside the contemplation of the state-law charter—the sort of liability that would have been imposed by the Sherman amendment—but on the consequences of activities actually undertaken within the scope of the powers conferred by state law.

[3] The view taken today is consistent with the understanding of the 42d Congress that unless the context revealed a more limited definition, "the word 'person' may extend and be applied to bodies politic and corporate . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431. It also accords with the interpretation given the same word when it was used by Senator Sherman in the antitrust legislation of 1890 bearing his name. See *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978) (plurality opinion); *Chattanooga Foundry* v. *Atlanta,* 203 U. S. 390, 396 (1906); cf. *Pfizer Inc.* v. *Government of India,* 434 U. S. 308 (1978).

that this principle also applies to a local government when implementation of its official policies or established customs inflicts the constitutional injury.

## II

This Court traditionally has been hesitant to overrule prior constructions of statutes or interpretations of common-law rules. *"Stare decisis* is usually the wise policy," *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting), but this cautionary principle must give way to countervailing considerations in appropriate circumstances.[4] I concur in the Court's view that this is not a case where we should "place on the shoulders of Congress the burden of the Court's own error." *Girouard* v. *United States,* 328 U. S. 61, 70 (1946).

Nor is this the usual case in which the Court is asked to overrule a precedent. Here considerations of *stare decisis* cut in both directions. On the one hand, we have a series of rulings that municipalities and counties are not "persons" for purposes of § 1983. On the other hand, many decisions of this Court have been premised on the amenability of school boards and similar entities to § 1983 suits.

In *Monroe* and its progeny, we have answered a question that was never actually briefed or argued in this Court— whether a municipality is liable in damages for injuries that are the direct result of its official policies. "The theory of the complaint [in *Monroe* was] that under the circumstances [t]here alleged the City [was] liable for the acts of its police officers, by virtue of *respondeat superior."* Brief for Petition-

---

[4] See, *e. g., Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36 (1977); *Machinists* v. *Wisconsin Emp. Rel. Comm'n,* 427 U. S. 132 (1976); *Braden* v. *30th Judicial Circuit Court of Ky.,* 410 U. S. 484 (1973); *Griffin* v. *Breckenridge,* 403 U. S. 88 (1971); *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235 (1970); *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–407, n. 1 (1932) (Brandeis, J., dissenting).

ers, O. T. 1960, No. 39, p. 21.[5] Respondents answered that adoption of petitioners' position would expose "Chicago and every other municipality in the United States . . . to Civil Rights Act liability through no action of its own and based on action contrary to its own ordinances and the laws of the state it is a part of." Brief for Respondents, O. T. 1960, No. 39, p. 26. Thus the ground of decision in *Monroe* was not advanced by either party and was broader than necessary to resolve the contentions made in that case.[6]

---

[5] The District Court in *Monroe* ruled in the municipality's favor, stating: "[S]ince the liability of the City of Chicago is based on the doctrine of *respondeat superior*, and since I have already held that the complaint fails to state a claim for relief against the agents of the city, there is no claim for relief against the city itself." Record, O. T. 1960, No. 39, p. 30. The Court of Appeals affirmed for the same reason. 272 F. 2d 365–366 (CA7 1959).

Petitioners in this Court also offered an alternative argument that the city of Chicago was a "person" for purposes of § 1983, Brief for Petitioners, O. T. 1960, No. 39, p. 25, but the underlying theory of municipal liability remained one of *respondeat superior*.

[6] The doctrine of *stare decisis* advances two important values of a rational system of law: (i) the certainty of legal principles and (ii) the wisdom of the conservative vision that existing rules should be presumed rational and not subject to modification "at any time a new thought seems appealing," dissenting opinion of MR. JUSTICE REHNQUIST, *post*, at 718; cf. O. Holmes, The Common Law 36 (1881). But, at the same time, the law has recognized the necessity of change, lest rules "simply persis[t] from blind imitation of the past." Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). Any overruling of prior precedent, whether of a constitutional decision or otherwise, disserves to some extent the value of certainty. But I think we owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations. That is the premise of the canon of interpretation that language in a decision not necessary to the holding may be accorded less weight in subsequent cases. I also would recognize the fact that until this case the Court has not had to confront squarely the consequences of holding § 1983 inapplicable to official municipal policies.

Of course, the mere fact that an issue was not argued or briefed does not undermine the precedential force of a considered holding. *Marbury*

Similarly, in *Moor* v. *County of Alameda,* 411 U. S. 693 (1973), petitioners asserted that "the County was vicariously liable for the acts of its deputies and sheriff," *id.,* at 696, under 42 U. S. C. § 1988. In rejecting this vicarious-liability claim, 411 U. S., at 710, and n. 27, we reaffirmed *Monroe's* reading of the statute, but there was no challenge in that case to "the holding in *Monroe* concerning the status under § 1983 of public entities such as the County," 411 U. S., at 700; Brief for Petitioners, O. T. 1972, No. 72–10, p. 9.

Only in *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973), did the Court confront a § 1983 claim based on conduct that was both authorized under state law and the direct cause of the claimed constitutional injury. In *Kenosha,* however, we raised the issue of the city's amenability to suit under § 1983 on our own initiative.[7]

This line of cases—from *Monroe* to *Kenosha*—is difficult to reconcile on a principled basis with a parallel series of cases

v. *Madison,* 1 Cranch 137 (1803), cited by the dissent, *post,* at 718, is a case in point. But the Court's recognition of its power to invalidate legislation not in conformity with constitutional command was essential to its judgment in *Marbury.* And on numerous subsequent occasions, the Court has been required to apply the full breadth of the *Marbury* holding. In *Monroe,* on the other hand, the Court's rationale was broader than necessary to meet the contentions of the parties and to decide the case in a principled manner. The language in *Monroe* cannot be dismissed as dicta, but we may take account of the fact that the Court simply was not confronted with the implications of holding § 1983 inapplicable to official municipal policies. It is an appreciation of those implications that has prompted today's re-examination of the legislative history of the 1871 measure.

[7] In *Aldinger* v. *Howard,* 427 U. S. 1, 16 (1976), we reaffirmed *Monroe,* but petitioner did not contest the proposition that counties were excluded from the reach of § 1983 under *Monroe,* and the question before us concerned the scope of pendent-party jurisdiction with respect to a state-law claim. Similarly, the parties in *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274 (1977), did not seek a re-examination of our ruling in *Monroe.*

in which the Court has assumed *sub silentio* that some local government entities could be sued under § 1983. If now, after full consideration of the question, we continued to adhere to *Monroe,* grave doubt would be cast upon the Court's exercise of § 1983 jurisdiction over school boards. See *ante,* at 663 n. 5. Since "the principle of blanket immunity established in *Monroe* cannot be cabined short of school boards," *ante,* at 696, the conflict is squarely presented. Although there was an independent basis of jurisdiction in many of the school board cases because of the inclusion of individual public officials as nominal parties, the opinions of this Court make explicit reference to the school board party, particularly in discussions of the relief to be awarded, see, *e. g., Green* v. *County School Board,* 391 U. S. 430, 437–439, 441–442 (1968); *Milliken* v. *Bradley,* 433 U. S. 267, 292–293 (1977) (POWELL, J., concurring in judgment). And, as the Court points out, *ante,* at 696–697, and nn. 62, 63, Congress has focused specifically on this Court's school board decisions in several statutes. Thus the exercise of § 1983 jurisdiction over school boards, while perhaps not premised on considered holdings, has been longstanding. Indeed, it predated *Monroe.*

Even if one attempts to explain away the school board decisions as involving suits which "may be maintained against board members in their official capacities for injunctive relief under either § 1983 or *Ex parte Young,* 209 U. S. 123 (1908)," *post,* at 716–717, n. 2, some difficulty remains in rationalizing the relevant body of precedents. At least two of the school board cases involved claims for monetary relief. *Cohen* v. *Chesterfield County School Board,* 326 F. Supp. 1159, 1161 (ED Va. 1971), rev'd, 474 F. 2d 395 (CA4 1973), rev'd and remanded, 414 U. S. 632 (1974); *Tinker* v. *Des Moines Independent School Dist.,* 393 U. S. 503, 504 (1969). See also *Vlandis* v. *Kline,* 412 U. S. 441, 445 (1973). Although the point was not squarely presented in this Court, these claims

for damages could not have been maintained in official-capacity suits if the government entity were not itself suable. Cf. *Edelman* v. *Jordan,* 415 U. S. 651 (1974).[8] Moreover, the rationale of *Kenosha* would have to be disturbed to avoid closing all avenues under § 1983 to injunctive relief against constitutional violations by local government. The Court of Appeals in this case suggested that we import, by analogy, the Eleventh Amendment fiction of *Ex parte Young* into § 1983, 532 F. 2d 259, 264–266 (CA2 1976). That approach, however, would create tension with *Kenosha* because it would require "a bifurcated application" of "the generic word 'person' in § 1983" to public officials "depending on the nature of the relief sought against them." 412 U. S., at 513. A public official sued in his official capacity for carrying out official policy would be a "person" for purposes of injunctive relief, but a non-"person" in an action for damages. The Court's holding avoids this difficulty. See *ante,* at 690 n. 55.

Finally, if we continued to adhere to a rule of absolute municipal immunity under § 1983, we could not long avoid the question whether "we should, by analogy to our decision in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983 . . . ." *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274, 278 (1977). One aspect of that inquiry would be whether there are any "special factors counselling hesitation in the absence of affirmative action by Congress," *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 396 (1971), such as an "explicit congressional declaration

---

[8] To the extent that the complaints in those cases asserted claims against the individual defendants in their personal capacity, as well as official capacity, the court would have had authority to award the relief requested. There is no suggestion in the opinions, however, that the practices at issue were anything other than official, duly authorized policies.

that persons injured by a [municipality] may not recover money damages . . . , but must instead be remitted to another remedy, equally effective in the view of Congress," *id.,* at 397. In light of the Court's persuasive re-examination in today's decision of the 1871 debates, I would have difficulty inferring from § 1983 "an explicit congressional declaration" against municipal liability for the implementation of official policies in violation of the Constitution. Rather than constitutionalize a cause of action against local government that Congress intended to create in 1871, the better course is to confess error and set the record straight, as the Court does today.[9]

## III

Difficult questions nevertheless remain for another day. There are substantial line-drawing problems in determining "when execution of a government's policy or custom" can be said to inflict constitutional injury such that "government as an entity is responsible under § 1983." *Ante,* at 694. This case, however, involves formal, written policies of a municipal department and school board; it is the clear case. The Court also reserves decision on the availability of a qualified municipal immunity. *Ante,* at 701. Initial resolution of the question whether the protection available at common law for municipal corporations, see *post,* at 720–721, or other principles support a

---

[9] MR. JUSTICE REHNQUIST's dissent makes a strong argument that "[s]ince *Monroe,* municipalities *have* had the right to expect that they would not be held liable retroactively for their officers' failure to predict this Court's recognition of new constitutional rights." *Post,* at 717. But it reasonably may be assumed that most municipalities already indemnify officials sued for conduct within the scope of their authority, a policy that furthers the important interest of attracting and retaining competent officers, board members, and employees. In any event, the possibility of a qualified immunity, as to which the Court reserves decision, may remove some of the harshness of liability for good-faith failure to predict the often uncertain course of constitutional adjudication.

qualified municipal immunity in the context of the § 1983 damages action, is left to the lower federal courts.

Mr. Justice Stevens, concurring in part.

Since Parts II and IV of the opinion of the Court are merely advisory and are not necessary to explain the Court's decision, I join only Parts I, III, and V.

Mr. Justice Rehnquist, with whom The Chief Justice joins, dissenting.

Seventeen years ago, in *Monroe* v. *Pape,* 365 U. S. 167 (1961), this Court held that the 42d Congress did not intend to subject a municipal corporation to liability as a "person" within the meaning of 42 U. S. C. § 1983. Since then, the Congress has remained silent, but this Court has reaffirmed that holding on at least three separate occasions. *Aldinger* v. *Howard,* 427 U. S. 1 (1976); *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973); *Moor* v. *County of Alameda,* 411 U. S. 693 (1973). See also *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274, 277–279 (1977). Today, the Court abandons this long and consistent line of precedents, offering in justification only an elaborate canvass of the same legislative history which was before the Court in 1961. Because I cannot agree that this Court is "free to disregard these precedents," which have been "considered maturely and recently" by this Court, *Runyon* v. *McCrary,* 427 U. S. 160, 186 (1976) (Powell, J., concurring), I am compelled to dissent.

I

As this Court has repeatedly recognized, *id.,* at 175 n. 12; *Edelman* v. *Jordan,* 415 U. S. 651, 671 n. 14 (1974), considerations of *stare decisis* are at their strongest when this Court confronts its previous constructions of legislation. In all cases, private parties shape their conduct according to this Court's settled construction of the law, but the Congress is at

liberty to correct our mistakes of statutory construction, unlike our constitutional interpretations, whenever it sees fit. The controlling principles were best stated by Mr. Justice Brandeis:

> "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions." *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–407 (1932) (dissenting opinion) (footnotes omitted).

Only the most compelling circumstances can justify this Court's abandonment of such firmly established statutory precedents. The best exposition of the proper burden of persuasion was delivered by Mr. Justice Harlan in *Monroe* itself:

> "From my point of view, the policy of *stare decisis,* as it should be applied in matters of statutory construction, and, to a lesser extent, the indications of congressional acceptance of this Court's earlier interpretation, require that it appear *beyond doubt* from the legislative history of the 1871 statute that [*United States* v.] *Classic,* [313 U. S. 299 (1941)] and *Screws* [v. *United States,* 325 U. S. 91 (1945)] misapprehended the meaning of the controlling provision, before a departure from what was decided in those cases would be justified." 365 U. S., at 192 (concurring opinion) (footnote omitted; emphasis added).

The Court does not demonstrate that any exception to this general rule is properly applicable here. The Court's first assertion, that *Monroe* "was a departure from prior practice," *ante,* at 695, is patently erroneous. Neither in *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943), nor in *Holmes* v. *Atlanta,*

350 U. S. 879 (1955), nor in any of the school board cases cited by the Court, *ante,* at 663 n. 5, was the question now before us raised by any of the litigants or addressed by this Court. As recently as four Terms ago, we said in *Hagans* v. *Lavine,* 415 U. S. 528, 535 n. 5 (1974):

> "Moreover, when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."

The source of this doctrine that jurisdictional issues decided *sub silentio* are not binding in other cases seems to be Mr. Chief Justice Marshall's remark in *United States* v. *More,* 3 Cranch 159, 172 (1805).[1] While the Chief Justice also said that such decisions may "have much weight, as they show that this point neither occurred to the bar or the bench," *Bank of the United States* v. *Deveaux,* 5 Cranch 61, 88 (1809), unconsidered assumptions of jurisdiction simply cannot outweigh four consistent decisions of this Court, explicitly considering and rejecting that jurisdiction.

Nor is there any indication that any later Congress has ever approved suit against any municipal corporation under § 1983. Of all its recent enactments, only the Civil Rights Attorney's Fees Awards Act of 1976, § 2, 90 Stat. 2641, 42 U. S. C. § 1988 (1976 ed.), explicitly deals with the Civil Rights Act of 1871.[2] The 1976 Act provides that attorney's fees may be awarded

---

[1] As we pointed out in *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274, 278–279 (1977), the existence of a claim for relief under § 1983 is "jurisdictional" for purposes of invoking 28 U. S. C. § 1343, even though the existence of a meritorious constitutional claim is not similarly required in order to invoke jurisdiction under 28 U. S. C. § 1331. See *Bell* v. *Hood,* 327 U. S. 678, 682 (1946).

[2] The other statutes cited by the Court, *ante,* at 697–699, n. 63, make no mention of § 1983, but refer generally to suits against "a local educational agency." As noted by the Court of Appeals, 532 F. 2d 259, 264–266, such suits may be maintained against board members in their official capacities

to the prevailing party "[i]n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title." There is plainly no language in the 1976 Act which would enlarge the parties suable under those substantive sections; it simply provides that parties who are already suable may be made liable for attorney's fees. As the Court admits, *ante,* at 699, the language in the Senate Report stating that liability may be imposed "whether or not the agency or government is a named party," S. Rep. No. 94–1011, p. 5 (1976), suggests that Congress did not view its purpose as being in any way inconsistent with the well-known holding of *Monroe.*

The Court's assertion that municipalities have no right to act "on an assumption that they can violate constitutional rights indefinitely," *ante,* at 700, is simply beside the point. Since *Monroe,* municipalities *have* had the right to expect that they would not be held liable retroactively for their officers' failure to predict this Court's recognition of new constitutional rights. No doubt innumerable municipal insurance policies and indemnity ordinances have been founded on this assumption, which is wholly justifiable under established principles of *stare decisis.* To obliterate those legitimate expectations without more compelling justifications than those advanced by the Court is a significant departure from our prior practice.

I cannot agree with MR. JUSTICE POWELL's view that "[w]e owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations." *Ante,* at 709 n. 6. Private parties must be able to rely upon explicitly stated holdings of this Court without being

---

for injunctive relief under either § 1983 or *Ex parte Young,* 209 U. S. 123 (1908). Congress did not stop to consider the technically proper avenue of relief, but merely responded to the fact that relief was being granted. The practical result of choosing the avenue suggested by petitioners would be the subjection of school corporations to liability in damages. Nothing in recent congressional history even remotely supports such a result.

obliged to peruse the briefs of the litigants to predict the likelihood that this Court might change its mind. To cast such doubt upon each of our cases, from *Marbury* v. *Madison,* 1 Cranch 137 (1803), forward, in which the explicit ground of decision "was never actually briefed or argued," *ante,* at 708 (POWELL, J., concurring), would introduce intolerable uncertainty into the law. Indeed, in *Marbury* itself, the argument of Charles Lee on behalf of the applicants—which, unlike the arguments in *Monroe,* is reproduced in the Reports of this Court where anyone can see it—devotes not a word to the question of whether this Court has the power to invalidate a statute duly enacted by the Congress. Neither this ground of decision nor any other was advanced by Secretary of State Madison, who evidently made no appearance. 1 Cranch, at 153–154. More recent landmark decisions of this Court would appear to be likewise vulnerable under my Brother POWELL's analysis. In *Mapp* v. *Ohio,* 367 U. S. 643 (1961), none of the parties requested the Court to overrule *Wolf* v. *Colorado,* 338 U. S. 25 (1949); it did so only at the request of an *amicus curiae.* 367 U. S., at 646 n. 3. That *Marbury, Mapp,* and countless other decisions retain their vitality despite their obvious flaws is a necessary byproduct of the adversary system, in which both judges and the general public rely upon litigants to present "all the relevant considerations." *Ante,* at 709 n. 6 (POWELL, J., concurring). While it undoubtedly has more latitude in the field of constitutional interpretation, this Court is surely not free to abandon settled statutory interpretation at any time a new thought seems appealing.[3]

Thus, our only task is to discern the intent of the 42d Congress. That intent was first expounded in *Monroe,* and it

---

[3] I find it somewhat ironic that, in abandoning the supposedly ill-considered holding of *Monroe,* my Brother POWELL relies heavily upon cases involving school boards, although he admits that "the exercise of § 1983 jurisdiction . . . [was] perhaps not premised on considered holdings." *Ante,* at 711.

has been followed consistently ever since. This is not some esoteric branch of the law in which congressional silence might reasonably be equated with congressional indifference. Indeed, this very year, the Senate has been holding hearings on a bill, S. 35, 95th Cong., 1st Sess. (1977), which would remove the municipal immunity recognized by *Monroe*. 124 Cong. Rec. D117 (daily ed. Feb. 8, 1978). In these circumstances, it cannot be disputed that established principles of *stare decisis* require this Court to pay the highest degree of deference to its prior holdings. *Monroe* may not be overruled unless it has been demonstrated "beyond doubt from the legislative history of the 1871 statute that [*Monroe*] misapprehended the meaning of the controlling provision." *Monroe,* 365 U. S., at 192 (Harlan, J., concurring). The Court must show not only that Congress, in rejecting the Sherman amendment, concluded that municipal liability was not unconstitutional, but also that, in enacting § 1, it intended to impose that liability. I am satisfied that no such showing has been made.

## II

Any analysis of the meaning of the word "person" in § 1983, which was originally enacted as § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, must begin, not with the Sherman amendment, but with the Dictionary Act. The latter Act, which supplied rules of construction for all legislation, provided:

> "That in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

The Act expressly provided that corporations need not be included within the scope of the word "person" where the context suggests a more limited reach. Not a word in the legislative history of the Act gives any indication of the contexts

in which Congress felt it appropriate to include a corporation as a person. Indeed, the chief cause of concern was that the Act's provision that "words importing the masculine gender may be applied to females," might lead to an inadvertent extension of the suffrage to women. Cong. Globe, 41st Cong., 3d Sess., 777 (1871) (remarks of Sen. Sawyer).

There are other factors, however, which suggest that the Congress which enacted § 1983 may well have intended the word "person" "to be used in a more limited sense," as *Monroe* concluded. It is true that this Court had held that both commercial corporations, *Louisville R. Co.* v. *Letson*, 2 How. 497, 558 (1844), and municipal corporations, *Cowles* v. *Mercer County*, 7 Wall. 118, 121 (1869), were "citizens" of a State within the meaning of the jurisdictional provisions of Art. III. Congress, however, also knew that this label did not apply in all contexts, since this Court, in *Paul* v. *Virginia*, 8 Wall. 168 (1869), had held commercial corporations not to be "citizens" within the meaning of the Privileges and Immunities Clause, U. S. Const., Art. IV, § 2. Thus, the Congress surely knew that, for constitutional purposes, corporations generally enjoyed a different status in different contexts. Indeed, it may be presumed that Congress intended that a corporation should enjoy the same status under the Ku Klux Klan Act as it did under the Fourteenth Amendment, since it had been assured that § 1 "was so very simple and really reënact[ed] the Constitution." Cong. Globe, 42d Cong., 1st Sess., 569 (1871) (remarks of Sen. Edmunds). At the time § 1983 was enacted the only federal case to consider the status of corporations under the Fourteenth Amendment had concluded, with impeccable logic, that a corporation was neither a "citizen" nor a "person." *Insurance Co.* v. *New Orleans*, 13 F. Cas. 67 (No. 7,052) (CC La. 1870).

Furthermore, the state courts did not speak with a single voice with regard to the tort liability of municipal corporations. Although many Members of Congress represented

States which had retained absolute municipal tort immunity, see, *e. g., Irvine* v. *Town of Greenwood,* 89 S. C. 511, 72 S. E. 228 (1911) (collecting earlier cases), other States had adopted the currently predominant distinction imposing liability for proprietary acts, see generally 2 F. Harper & F. James, Law of Torts § 29.6 (1956), as early as 1842, *Bailey* v. *Mayor of City of New York,* 3 Hill 531 (N. Y. 1842). Nevertheless, no state court had ever held that municipal corporations were always liable in tort in precisely the same manner as other persons.

The general remarks from the floor on the liberal purposes of § 1 offer no explicit guidance as to the parties against whom the remedy could be enforced. As the Court concedes, only Representative Bingham raised a concern which could be satisfied only by relief against governmental bodies. Yet he never directly related this concern to § 1 of the Act. Indeed, Bingham stated at the outset, "I do not propose now to discuss the provisions of the bill in detail," Cong. Globe, 42d Cong., 1st Sess., App. 82 (1871), and, true to his word, he launched into an extended discourse on the beneficent purposes of the Fourteenth Amendment. While Bingham clearly stated that Congress could "provide that no citizen in any State shall be deprived of his property by State law or the judgment of a State court without just compensation therefor," *id.,* at 85, he never suggested that such a power was exercised in § 1.[4]

---

[4] It has not been generally thought, before today, that § 1983 provided an avenue of relief from unconstitutional takings. Those federal courts which have granted compensation against state and local governments have resorted to an implied right of action under the Fifth and Fourteenth Amendments. *Richmond Elks Hall Assn.* v. *Richmond Redevelopment Agency,* 561 F. 2d 1327 (CA9 1977), aff'g 389 F. Supp. 486 (ND Cal. 1975); *Foster* v. *Detroit,* 405 F. 2d 138, 140 (CA6 1968). Since the Court today abandons the holding of *Monroe* chiefly on the strength of Bingham's arguments, it is indeed anomalous that § 1983 will provide relief only when a local government, not the State itself, seizes private property. See *ante,* at 690 n. 54; *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 452 (1976); *Edelman* v. *Jordan,* 415 U. S. 651, 674–677 (1974).

Finally, while Bingham has often been advanced as the chief expositor of the Fourteenth Amendment, *Duncan* v. *Louisiana,* 391 U. S. 145, 165 (1968) (Black, J., concurring); *Adamson* v. *California,* 332 U. S. 46, 73–74 (1947) (Black, J., dissenting), there is nothing to indicate that his colleagues placed any greater credence in his theories than has this Court. See *Duncan, supra,* at 174–176 (Harlan, J., dissenting); *Adamson, supra,* at 64 (Frankfurter, J., concurring).

Thus, it ought not lightly to be presumed, as the Court does today, *ante,* at 690 n. 53, that § 1983 "should prima facie be construed to include 'bodies politic' among the entities that could be sued." Neither the Dictionary Act, the ambivalent state of judicial decisions, nor the floor debate on § 1 of the Act gives any indication that any Member of Congress had any inkling that § 1 could be used to impose liability on municipalities. Although Senator Thurman, as the Court emphasizes, *ante,* at 686 n. 45, expressed his belief that the terms of § 1 "are as comprehensive as can be used," Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871), an examination of his lengthy remarks demonstrates that it never occurred to him that § 1 did impose or could have imposed any liability upon municipal corporations. In an extended parade of horribles, this "old Roman," who was one of the Act's most implacable opponents, suggested that state legislatures, Members of Congress, and state judges might be held liable under the Act. *Ibid.* If, at that point in the debate, he had any idea that § 1 was designed to impose tort liability upon cities and counties, he would surely have raised an additional outraged objection. Only once was that possibility placed squarely before the Congress—in its consideration of the Sherman amendment—and the Congress squarely rejected it.

The Court is probably correct that the rejection of the Sherman amendment does not lead ineluctably to the conclusion that Congress intended municipalities to be immune from liability under all circumstances. Nevertheless, it cannot be

denied that the debate on that amendment, the only explicit consideration of municipal tort liability, sheds considerable light on the Congress' understanding of the status of municipal corporations in that context. Opponents of the amendment were well aware that municipalities had been subjected to the jurisdiction of the federal courts in the context of suits to enforce their contracts, Cong. Globe, 42d Cong., 1st Sess., 789 (1871) (remarks of Rep. Kerr), but they expressed their skepticism that such jurisdiction should be exercised in cases sounding in tort:

> "Suppose a judgment obtained under this section, and no property can be found to levy upon except the court-house, can we levy on the court-house and sell it? So this section provides, and that too in an action of tort, in an action *ex delicto,* where the county has never entered into any contract, where the State has never authorized the county to assume any liability of the sort or imposed any liability upon it. It is in my opinion simply absurd." *Id.,* at 799 (remarks of Rep. Farnsworth).

Whatever the merits of the constitutional arguments raised against it, the fact remains that Congress rejected the concept of municipal tort liability on the only occasion in which the question was explicitly presented. Admittedly this fact is not conclusive as to whether Congress intended § 1 to embrace a municipal corporation within the meaning of "person," and thus the reasoning of *Monroe* on this point is subject to challenge. The meaning of § 1 of the Act of 1871 has been subjected in this case to a more searching and careful analysis than it was in *Monroe,* and it may well be that on the basis of this closer analysis of the legislative debates a conclusion contrary to the *Monroe* holding could have been reached when that case was decided 17 years ago. But the rejection of the Sherman amendment remains instructive in that here alone did the legislative debates squarely focus on the liability of municipal corporations, and that liability was rejected.

Any inference which might be drawn from the Dictionary Act or from general expressions of benevolence in the debate on § 1 that the word "person" was intended to include municipal corporations falls far short of showing "beyond doubt" that this Court in *Monroe* "misapprehended the meaning of the controlling provision." Errors such as the Court may have fallen into in *Monroe* do not end the inquiry as to *stare decisis;* they merely begin it. I would adhere to the holding of *Monroe* as to the liability of a municipal corporation under § 1983.

## III

The decision in *Monroe* v. *Pape* was the fountainhead of the torrent of civil rights litigation of the last 17 years. Using § 1983 as a vehicle, the courts have articulated new and previously unforeseeable interpretations of the Fourteenth Amendment. At the same time, the doctrine of municipal immunity enunciated in *Monroe* has protected municipalities and their limited treasuries from the consequences of their officials' failure to predict the course of this Court's constitutional jurisprudence. None of the Members of this Court can foresee the practical consequences of today's removal of that protection. Only the Congress, which has the benefit of the advice of every segment of this diverse Nation, is equipped to consider the results of such a drastic change in the law. It seems all but inevitable that it will find it necessary to do so after today's decision.

I would affirm the judgment of the Court of Appeals.