OPINION OF THE COURT
Lynn R. Kotler, J.
This action arises from plaintiffs arrest. Defendants City of New York, Detective Joseph Nicolosi (sometimes herein referred to as Detective Nicolisi), shield No. 06341, Police Officer (P.O.) “John Doe #1,” shield No. 5853, P.O. “John Doe #2,” shield No. 6118, P.O. Bhagan and P.O. Clark move to dismiss and/or for summary judgment (CPLR 3211, 3212). Plaintiff opposes the motion. The motion is decided as follows.
*924 Facts
According to his complaint, plaintiff was arrested on November 20, 2008 after members of the New York City Police Department (NYPD) executed a search warrant at 1116 Tinton Avenue, apartment 4B, Bronx, New York. Plaintiff testified about the events leading up to his arrest at his deposition as follows. Plaintiff went to the gym the morning of his arrest. As he was leaving the gym, he received a phone call from his wife, Jennifer Manzanillo, who told him “to meet her at her house.” Plaintiff’s wife’s “house” is the apartment. Plaintiff went directly from the gym to the apartment. He arrived at the apartment between 9:30 and 10:00 a.m. Plaintiff rung the bell to the apartment and his wife’s mother buzzed him in. When he got to the door of the apartment, his wife’s mother let him' in. Plaintiff had been to the apartment at least more than 10 times.
The apartment had three bedrooms. Plaintiff’s wife lived in one bedroom, plaintiff’s wife’s mother lived in a second bedroom, and plaintiff’s wife’s brother, Ravelo Manzanillo, his wife and his daughter lived in the third room. When plaintiff entered the apartment, he went directly into his wife’s room. His wife was not home at the time he arrived. Other than his wife’s mother, “Ravelo’s daughter and the mother had a friend” at the apartment. According to plaintiff, all three of these individuals were in the living room. Plaintiff got undressed, left his clothes in his wife’s bedroom and took a shower while he waited for his wife to arrive. Meanwhile, about five minutes later, “the A-Team came in, I don’t know what they call it, narcotics task force, came in.”
Plaintiff further testified as follows:
“Q. What, if anything, did you hear while you were taking a shower; could you hear anything taking place in the apartment?
“A. Just screaming and a bunch of booms, a loud pounding noise and screams.
“Q. Do you know who was screaming?
“A. Her mother and her mother’s friend.
“Q. Could you decipher any words or conversation while you were in the shower?
“A. No, the water was running, it was over my ears.
“Q. What do you mean when you said you were hearing booms?
*925 “A. Like boom, like they exit without knocking, they broke down the door. . . .
“Q. Did anyone have time to enter the bathroom while you were taking a shower?
“A. Yes.
“Q. Who did?
“A. Several officers broke down the bathroom door. . . .
“Q. Did any of those officers enter the bathroom?
“A. Yes.
“Q. Do you know how many?
“A. Two. . . .
“Q. Did any of the two officers say anything when they entered the bathroom?
“A. Yes.
“Q. What did they say?
“A. Turn off the water and get out the shower. . . .
“Q. Did you say anything in response?
“A. No.
“Q. Did you do anything in response?
“A. Turn off the water and got out the shower.
“Q. Did Detective Nicholas say anything else while he was in the shower?
“A. Told me to find my towel.
“Q. Did he say anything else?
“A. He asked who I was and why was I there.
“Q. Did you respond?
“A. Yes.
“Q. How did you respond?
“A. I said, ‘My wife lives here.’ In return he said, ‘Who is your wife, are you legally married?’ I said, Yes, my wife, Jennifer Manzanillo lives here and I was waiting for her to return.’ That was it. . . .
“Q. Did any of those two officers identify themselves as police officers at any point?
“A. Joseph, after he asked me who I was and what I was doing there, he said, ‘Well, I’m Detective Nicholas, Joseph and we are conducting a search warrant.’ That is what he said.”
Detective Nicholas, whose actual name is Detective Joseph Nicolisi, eventually told plaintiff that the police were “conduct *926 ing a search warrant on someone living in the house accused of selling narcotics.” Plaintiff waited in the hallway outside the bathroom for approximately 10 minutes with his hands on his head. Detective Nicolisi then asked plaintiff where his clothes were. Plaintiff told him they were on the bed. Detective Nicolisi led plaintiff to his wife’s bedroom to retrieve his clothes. He asked plaintiff for ID and after looking at his ID told plaintiff he lived in a “bad area.” Detective Nicolisi asked plaintiff where his wife was again. Plaintiff said “she is with her brother.”
Detective Nicolisi then told plaintiff to get dressed. As he was dressing, Detective Nicolisi asked if plaintiff had any other clothes there. Plaintiff said no. Detective Nicolisi then asked, “how is this possible if this is your wife?” Plaintiff told him, “we don’t live together, we are going to get an apartment together soon, I was just released from prison.” Plaintiff finished getting dressed and Detective Nicolisi “put the handcuffs on [him] as soon as [he] put [his] shirt on.” Plaintiff asked, “ [i] f I’m not a part of this search warrant or being arrested, why am I being put in handcuffs?” Detective Nicolisi allegedly said, “we’ll figure it out later.”
Plaintiff was then told to sit on the couch with his mother-in-law and her friend, who were also in handcuffs. Plaintiff asked Detective Nicolisi:
“[W]hy am I being placed in handcuffs if you, meaning Joseph, told me that the search warrant wasn’t for me, was involved with me at all whatsoever. And then in return, Joseph kept saying, then tell me who you really is, like as if I lied about who I was. Joseph said, 1 have been investigating this apartment for a long time, I never saw you, never met you, who are you?’ I told him, ‘I’m Antoine Flowers, like I said is on my ID, my wife live here, I was waiting for her to come.’ ”
Plaintiff had been released from prison on September 15, 2008. Plaintiff could not recall at his deposition how frequently he went to the apartment prior to his arrest, but since his release from prison, he stated that he had “spent the night in that apartment the most three times.”
Plaintiff also testified that Detective Nicolisi told him that “[he] was going to jail because if [he] was in that house [he] had to know what was going on in the house.”
Plaintiff, his mother-in-law and her friend were then led out of the house and placed in the back of a van. Already inside the *927 van were plaintiff’s wife, her brother and his wife. They were all taken to the precinct. At this point, plaintiff claims that he still had not been told why he had been arrested. Eventually, plaintiff found out from his lawyer shortly before his arraignment that he had been arrested for “[possession of narcotics and being in the house.”
Plaintiff was charged with criminal sale of a controlled substance in the third degree (Penal Law § 220.39 [1]) and criminally using drug paraphernalia in the second degree (Penal Law § 220.50 [2]). Plaintiff was indicted by the grand jury on November 26, 2008, for criminal possession of a controlled substance in the third degree, criminally using drug paraphernalia in the second degree, and one count of unlawfully dealing with a child in the first degree (Penal Law § 260.20). Plaintiff remained incarcerated from November 20, 2008 until January 6, 2010, when the indictment was dismissed on recommendation of Assistant District Attorney (ADA) Michele R. Molfetta.
Defendants have provided affirmations by Assistant District Attorney Rosemary Yu and ADA Molfetta, who both handled plaintiff’s prosecution in the underlying criminal case. The following facts are based upon ADA Yu’s affirmation. ADA Yu held the position of ADA with the NYC Special Narcotics Prosecutor between approximately September 2005 and May 2010. As an ADA with Special Narcotics, ADA Yu “worked closely with members of the [NYPD] Narcotics Division to investigate and mount prosecutions against individuals involved in the possession and sale of narcotics.” In November 2008, ADA Yu was assigned to a “long term investigation and prosecution, the target of which was . . . Ravelo Manzanillo . . . , who sold crack/cocaine from [the apartment].” Detective Nicolisi was the lead investigator for this investigation.
ADA Yu prepared and approved an affidavit by Detective Nicolisi based upon several controlled purchases of crack/ cocaine at the apartment by a confidential informant (Cl), which was submitted in support of' a search warrant for the apartment. On November 17, 2008, Justice Neil Ross issued search warrant number 1198-08 authorizing a search of the apartment. Defendants have provided a copy of the redacted search warrant to the court.
Detective Nicolisi testified at his deposition about plaintiff’s arrest. He stated that aside from plaintiff’s clothes, no other personal property belonging to plaintiff was found in the apart *928 ment. Detective Nicolisi also stated that “[a] quantity of crack cocaine” and “paraphernalia” were recovered from a dresser drawer in “the bedroom that [plaintiff] needed to recover his clothing out of that he state[d] that he stayed in.” When further asked about what plaintiff had said to him, Detective Nicolisi further testified that plaintiff told him, “[‘]I need to get my clothes out of the bedroom. That’s where I stay, stayed, staying. □ However it was stated at that point.”
When asked specifically about where the drugs were found, Detective Nicolisi testified as follows:
“Q. Where was it found?
“A. The best of my recollection, it was on the top of the dresser or inside of the top open drawer of the dresser, visible. It was visible in the upper part of the dresser.
“Q. I’m sorry. Either on the top of the dresser or in an open drawer on the dresser?
“A. In the open top drawer of the dresser.
“Q. Would you have written anywhere exactly where the drugs were found?
“A. No, ma’am.
“Q. Would that have been in your memo book?
“A. Not necessarily, ma’am.
“Q. But at time that you found the drugs, [plaintiff] wasn’t physically in that room?
“A. He was not, ma’am.
“Q. Just his clothes were?
“A. Yes, ma’am.”
Detective Nicolisi was asked what the basis for plaintiff’s arrest was:
“Q. Was your basis that [plaintiff] was in possession of this cocaine that was found in this drawer?
“Defense Counsel: You mean that formulated the probable cause for the arrest of [plaintiff]?
“Plaintiff’s Counsel: No. What was his basis for believing that [plaintiff] possessed this cocaine that was in a separate room?
“A. He said that’s the room I stay in. . . .
“Q. After [plaintiff] made those statements to you and after you found the quantity of crack cocaine and the drug paraphernalia in that bedroom, is that what formed the probable cause for your arrest of *929 [plaintiff]?
“A. Yes, ma’am.”
In her affirmation, ADA Yu states that based upon information given to her by Detective Nicolisi, to wit, that
(1) “[plaintiff] was found naked or semi-naked in a bathroom adjacent to a bedroom where [plaintiff’s] clothing was located, and where a quantity of over 8 grams of cocaine, drug paraphernalia (small empty Ziploc bags matching the bags in which crack/cocaine from the . . . Apartment had previously been sold, and razor blades were found in plain view in an open drawer”; (2) that “[plaintiff] identified the bedroom as belonging to his girlfriend, Manzanillo’s sister”; and (3) “that he further stated that he shared the room with her,” ADA Yu “consulted with [her] supervisors and made the decision, independent of Detective Nicolosi and the NYPD, that a felony complaint should be drafted charging [plaintiff]).”
ADA Yu explains in her affirmation the procedural history of plaintiff’s underlying criminal case. Plaintiff made a motion to dismiss the indictment based upon a theory that he had been denied his right to testify before the grand jury. On January 6, 2009, Justice Michael Ambrecht denied that motion in a decision/order providing in pertinent part: “[fjinally, the Court finds that the [plaintiff] has failed to demonstrate that the result of the grand jury proceeding would have been different had he testified, especially in light of [plaintiff’s] significant criminal history, including felony narcotics convictions.” Plaintiff then made a motion to dismiss the indictment for facial insufficiency. Justice Ambrecht denied that motion in a decision/order dated March 6, 2009, finding “the evidence presented to be factually, legally and procedurally sufficient to support all counts of the indictment with which [plaintiff] is charged.”
ADA Molfetta states in her affirmation the following: in or around January 2009, she replaced ADA Yu as the ADA in charge of plaintiff’s prosecution. On behalf of the People, ADA Molfetta opposed plaintiff’s motion to dismiss the indictment pursuant to CPL 30.30 based upon alleged speedy trial violations. In a decision/order dated July 28, 2009, Justice Ruth Pickholz denied that motion. ADA Molfetta also opposed plaintiff’s motion to sever his criminal trial from that of his codefendant, Ravelo Manzanillo. The motion to sever was *930 denied by Justice Ambrecht in a decision/order dated March 20, 2009.
ADA Molfetta represented the People in a hearing held pursuant to People v Darden (34 NY2d 177 [1974]) to produce the Cl for questioning regarding the basis of probable cause for the search warrant. That hearing was held before Justice Son-berg, who stated in a decision/order dated December 11, 2009, “the court concludes that the communications attributed by the officer to the confidential informant were in fact made and carried sufficient indicia of reliability to permit the officer to reasonably credit them.”
On December 1, 2009, Ravelo Manzanillo pleaded guilty to one count of criminal sale of a controlled substance in the second degree (Penal Law § 220.41). On January 6, 2010, ADA Molfetta submitted a recommendation for dismissal of the indictment to the court, which provides in pertinent part: “based upon information learned subsequent to the indictment, coupled with the small quantity of cocaine recovered, the People cannot prove beyond a reasonable doubt that the defendant possessed the cocaine with the intent to sell it. Accordingly, the People recommend that the indictment be dismissed.”
Both AD As Yu and Molfetta state in their affirmations that
“no evidence ever came to light during [her] involvement in [plaintiff’s prosecution] that Detective Nicolosi lacked probable cause to believe that [plaintiff] committed the underlying offenses, that Detective Nicolosi consciously falsified the information contained in his felony complaint or that he acted in bad faith with regard to his limited part in initiating a prosecution.”
On February 25, 2010, plaintiff served a notice of claim naming the City of New York and the NYPD as respondents. Plaintiff commenced this action on October 1, 2010 and asserted the following causes of action (COA): false arrest (first COA); malicious prosecution (second COA); negligence in the performance of duties (third COA); negligent hiring and retention (fourth COA); negligent supervision (fifth COA) and violation of civil rights (sixth COA).
Parties’ Arguments
Defendants argue that all common-law causes of action against the individually named defendants must be dismissed for failure to comply with General Municipal Law § 50-e. Defendants contend that the individually named defendants, *931 except Detective Nicolisi, are also entitled to summary judgment because they did not participate in plaintiffs arrest. Defendants next argue that they are entitled to summary judgment on all of plaintiff’s claims because probable cause supported plaintiff’s arrest and otherwise plaintiff has failed to state a cause of action. Defendants maintain that the individual officers are entitled to qualified immunity. Finally, defendants seek dismissal of plaintiff’s request for punitive damages.
In turn, plaintiff argues that defendants have failed to establish entitlement to judgment as a matter of law and, at the least, there are triable issues of fact as to whether there was probable cause for plaintiff’s arrest. Plaintiff consents to dismissal of the fourth COA. Plaintiff otherwise does not oppose defendants’ motion.
Discussion
Since note of issue has been joined and the motion is timely, the court will consider this a motion for summary judgment. On a motion for summary judgment, the proponent bears the initial burden of setting forth evidentiary facts to prove a prima facie case that would entitle it to judgment in its favor, without the need for a trial (CPLR 3212; Winegrad v New York Univ. Med. Ctr, 64 NY2d 851 [1985]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). If the proponent fails to make out its prima facie case for summary judgment, however, then its motion must be denied, regardless of the sufficiency of the opposing papers (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]; Ayotte v Gervasio, 81 NY2d 1062 [1993]).
Granting a motion for summary judgment is the functional equivalent of a trial, therefore it is a drastic remedy that should not be granted where there is any doubt as to the existence of a triable issue (Rotuba Extruders v Ceppos, 46 NY2d 223 [1978]). The court’s function on these motions is limited to “issue finding,” not “issue determination” (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957]).
The court finds that the defendants have not met their heavy burden on this motion as to plaintiff’s causes of action for false arrest and malicious prosecution. The existence of probable cause to arrest is a complete defense to claims of false arrest and malicious prosecution (Marrero v City of New York, 33 AD3d 556 [1st Dept 2006]). “The existence or absence of probable cause becomes a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn surrounding the arrest” *932 (MacDonald v Town of Greenburgh, 112 AD3d 586, 586-587 [2d Dept 2013]). When a defendant moves for summary judgment on the basis that probable cause serves as a defense to claims for false arrest or malicious prosecution, “the facts must be viewed in the light most favorable ,to the plaintiff, and every available inference must be drawn in the plaintiff’s favor” (De Lourdes Torres v Jones, 26 NY3d 742, 763 [Feb. 23, 2016]).
“Under this summary judgment standard, even if the jury at a trial could, or likely would, decline to draw inferences favorable to the plaintiff on issues of probable cause and malice, the court on a summary judgment motion must indulge all available inferences of the absence of probable cause and the existence of malice.” (Id.)
Here, while defendants have provided the deposition testimony of Detective Nicolisi and the affirmations of the ADAs who handled plaintiff’s criminal prosecution, defendants have failed to establish as a matter of law that Detective Nicolisi had probable cause to arrest plaintiff. Detective Nicolisi’s deposition testimony, standing alone, does not establish that his decision to arrest plaintiff under the circumstances as he saw them was based upon a reasonable belief that plaintiff possessed the drugs that were found at the apartment or used the drug paraphernalia that was also recovered. Indeed, Detective Nicolisi admitted during his deposition that he had conducted a long-term investigation of the apartment and had never seen the plaintiff at the apartment before. Further, it is undisputed that plaintiff was not found in the room where the drugs were recovered and that no other property belonging to the plaintiff was recovered from the apartment aside from the clothes plaintiff claims he was wearing prior to taking a shower. Defendants’ argument that there are no triable issues of fact as to whether there was probable cause to believe plaintiff construe-, tively possessed the drugs also fails based upon the same reasoning. This record is devoid of sufficient facts which would conclusively establish that Detective Nicolisi had probable cause to arrest plaintiff as a matter of law.
While Detective Nicolisi may have had probable cause for plaintiff’s arrest, a reasonable jury could find the absence of probable cause for his arrest. Indeed, even if the defendants had met their burden on this motion with respect to the first and second COAs, plaintiff’s version of the events along with the undisputed facts here raise triable issues of fact sufficient *933 to defeat the motion. Plaintiff claims that he had been in the apartment three times since he had been released from prison several months earlier and that he had only been in the apartment for a few minutes prior to the police entering the apartment. Plaintiff claims he did not live in the apartment and did not know that there were drugs in the partially open drawer. Accordingly, defendants’ motion for summary judgment as to the first and second causes of action against defendants City of New York and the Police Department of the City of New York must be denied.
The court must, however, grant defendants’ motion with respect to plaintiff’s claims against the individual defendants, except for Detective Nicolisi, as well as the fourth and sixth COAs in their entirety. Defendants argue that plaintiff failed to comply with General Municipal Law § 50-e by timely filing a notice of claim against the individual defendants for any state law claims and his time to do so has expired. However, plaintiff contends that General Municipal Law § 50-e does not require him to name the individual officers and cites Goodwin v Pretorius (105 AD3d 207 [4th Dept 2013]). Goodwin involved a medical malpractice claim against a county medical facility. The plaintiff in Goodwin served a notice of claim naming the medical facility the sole defendant and commenced an action against the medical facility as well as five named employees of that facility. The Goodwin Court held that the individual employees did not need to be named in a notice of claim as a condition precedent to commencing an action against them.
This court is bound to follow appellate precedent. Goodwin was discussed at length in Alvarez v City of New York (134 AD3d 599 [2015]), a First Department decision. In Alvarez, the First Department rejected Goodwin as a departure from its own precedent in Tannenbaum v City of New York (30 AD3d 357 [1st Dept 2006]). Tannenbaum stands for the proposition that if the notice of claim does not name an individual, any state law claims in a subsequent action against that individual must be dismissed for failure to comply with General Municipal Law § 50-e.
In light of the First Department’s holdings in Alvarez and Tannenbaum, this court must dismiss plaintiff’s claims against all individual officers for failure to comply with General Municipal Law § 50-e.
As for the fourth COA, plaintiff concedes to dismissal of that claim. With respect to the sixth COA, plaintiff has failed *934 to allege sufficient facts to support a Monell claim against the defendants on a theory of respondeat superior (Elie v City of New York, 92 AD3d 716 [2d Dept 2012], citing Monell v New York City Dept. of Social Servs., 436 US 658, 691 [1978]). Municipal liability for the violation of plaintiff’s constitutional rights may be imposed only by establishing “a direct causal link between a municipal policy or custom and the alleged constitutional deprivation” (Canton v Harris, 489 US 378, 385 [1989]; see Monell at 694). In order to assert a cause of action pursuant to 42 USC § 1983 against a municipality, “the action that is alleged to be unconstitutional [must] implement [ ] or execute! ] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers” (Monell, 436 US at 690) or have occurred because of a practice “so permanent and well settled as to constitute a ‘custom or usage’ with the force of law” (Monell, 436 US at 691; see also Maio v Kralik, 70 AD3d 1, 10-11 [2d Dept 2009]). Here, plaintiff has wholly failed to allege any facts which would support a claim that his arrest was the direct result of a municipal policy or custom. For at least this reason, plaintiffs sixth COA must be dismissed.
As for the third and fifth causes of action, plaintiff has not opposed that portion of the motion. Further, the court finds that defendants are entitled to summary judgment dismissing these claims as there are insufficient facts on this record to support claims for negligence or negligent supervision. Accordingly, the third and fifth COAs are also dismissed.
Accordingly, defendants’ motion is granted only to the extent that the fourth and sixth COAs are severed and dismissed, as well as all claims against Detective Joseph Nicolosi, P.O. “John Doe #1,” shield No. 5853, P.O. “John Doe #2,” shield No. 6118, P.O. Bhagan and P.O. Clark.
Conclusion
In accordance herewith, it is hereby ordered that defendants’ motion is granted to the following extent: (1) the third, fourth, fifth and sixth causes of action are severed and dismissed; and (2) all claims against Detective Joseph Nicolosi, P.O. “John Doe #1,” shield No. 5853, P.O. “John Doe #2,” shield No. 6118, P.O. Bhagan and P.O. Clark are severed and dismissed; and it is further ordered that defendants’ motion is otherwise denied.
Any requested relief not expressly addressed herein has nonetheless been considered and is hereby expressly rejected.